[Cite as *State v. Adams*, 2017-Ohio-7743.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27141 |
| | : | |
| v. | : | Trial Court Case No. 2014-TRC-8413 |
| | : | |
| DAVID D. ADAMS | : | (Criminal Appeal from |
| | : | Municipal Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of September, 2017.

. . . . . . . . . . .

MATTHEW KORTJOHN, Atty. Reg. No. 0083743, City of Dayton Prosecutor's Office, 335 West Third Street, Suite 372, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee

BROCK SCHOENLEIN, Atty. Reg. No. 0084707, 371 West First Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} This case is before us on the appeal of Defendant-Appellant, David Adams, from his conviction under R.C. 4511.19(A)(1)(d) for Driving Under the Influence of Alcohol or Drugs ("OVI"). Primarily, Adams challenges the trial court's rulings on his motion to suppress and a motion in limine filed by Plaintiff-Appellee, State of Ohio.

{¶ 2} Adams contends that the trial court erred in concluding that the arresting officer had a reasonable articulable suspicion for imposing field sobriety testing. In addition, Adams contends that he was prejudiced because a second horizontal gaze nystagmus ("HGN") test was not conducted in strict compliance with the 2013 National Highway Traffic Safety Administration ("NHTSA") manual. Adams also maintains that the arresting officer lacked probable cause for an arrest, and that the officer's misrepresentations rendered Adams' consent to a breath sample involuntary. Finally, Adams argues that the trial court erred in granting the State's motion in limine, which asked the court to preclude Adams from presenting evidence at trial concerning his impairment or lack of impairment.

{¶ 3} We conclude that, after the first HGN test was administered, the officer informed Adams that he passed the test and was free or fine to go. This terminated the lawful detention absent the discovery of additional evidence of impairment or other criminal activity that would support a reasonable, articulable suspicion to conduct further testing. As a result, the trial court erred in overruling the motion to suppress with respect to Adams' contention that he was unlawfully detained after the results of the first field sobriety tests were obtained. However, the case must be remanded so that the trial court can consider, based on appropriate standards, whether Adams voluntarily consented

thereafter to a portable breath test. In view of these conclusions, the remaining assignments of error are moot. Accordingly, the judgment of the trial court will be reversed, and this cause will be remanded for further proceedings.

I. Facts and Course of Proceedings

{¶ 4} The following facts were elicited during the suppression hearing. On the evening of June 27, 2014, and into the early morning hours of June 28, 2014, a Dayton Police Department OVI Task Force was conducting a "zero refusal" checkpoint on Wayne Avenue at the location of the Esther Price Candy Company. At the time, Dayton Police Officer, Johnathon Seiter, was employed with the department's traffic services unit; his day-to-day duties involved investigating fatal crashes and hit-and-run violations. However, on June 28, 2014, Seiter had been assigned to conduct a "saturation patrol," during which he patrolled the area around the checkpoint to detect impaired drivers.

{¶ 5} Around 12:45 a.m., Seiter was about a half-mile away from the checkpoint, and encountered Adams coming off a side street (Park Drive), that intersected with Wayne Avenue. Park Drive was north of the checkpoint and was also north of Wyoming Avenue. Adams had stopped partially in the traveled portion of Wayne Avenue. There was no stop line, and Adams was past the apex of the curb by about three feet. He was turning right. Adams turned right onto Wayne Avenue and then turned left, or eastbound, onto Wyoming Avenue, at a traffic light.

{¶ 6} During the suppression hearing, Seiter testified that his attention was directed to Adams for two reasons: (1) Adams was partially in the travel lane; and (2) when Adams drove by, Adams had a cigarette hanging from his mouth and looked straight

ahead rather than from side to side. According to Seiter, it is "unusual" for a sober person to look straight ahead while driving. Seiter stated that there was absolutely no evidence that Adams was attempting to avoid the OVI checkpoint.

{¶ 7} After Adams turned left onto Wyoming Avenue, Seiter observed Adams' vehicle touch the yellow center line and come back to the right three or four times. There were cars parked on the right side of the road and the road was narrow. Subsequently, Adams turned left, or northbound, onto Steve Whalen Avenue. At this time, Seiter began to monitor Adams' speed, using his own speedometer in conjunction with his radar, which was set in stationary mode. Adams was traveling at a steady pace of 52 miles per hour in a 45 mile per hour zone, and, at one point, reached a speed of 55 miles per hour for a few seconds before slowing down. After pacing Adams for about a quarter of a mile, Seiter initiated a traffic stop.

{¶ 8} Upon making contact with Adams, Seiter noticed Adams' face was "flush" and a moderate alcohol odor was coming from the car.[1] Seiter asked Adams for his driver's license and proof of insurance. Adams produced his license immediately, but "fumbled" while looking for his insurance card. Seiter defined "fumbling" as having trouble finding the paper; he also indicated during cross-examination that Seiter was looking through the papers he had in his glove box. Transcript of Proceedings, Vol. I, pp. 44 and 96-97.

{¶ 9} During cross-examination, Seiter also testified that he noticed "glassy eyes,"

---

[1] In the videotape of the stop, Seiter stated, upon first encountering Adams, that he was asking Adams about alcohol, because it smelled "a little bit." During cross-examination at the suppression hearing, Seiter testified that this comment was consistent with his testimony on direct examination that there was a "moderate" smell of alcohol. Seiter commented that a "slight" smell is consistent with smelling hardly anything at all.

even though he did not put this in his report. Adams' speech was not slurred. Seiter asked Adams if he had anything to drink, and Adams said he had one drink about three hours earlier. Following this conversation, Seiter asked Adams to exit the car and come back to his cruiser. Adams did not use the car for support when getting out and had no balance issues while walking back to the cruiser. Seiter then placed Adams in his cruiser while waiting for another officer to arrive. He stated that he placed Adams in the cruiser to see if Adams had spilled alcohol in the car or on himself, and to differentiate the odor from Adams' cigarette. As Adams sat in the cruiser, the alcohol smell became more pronounced.

{¶ 10} After Officer Gross arrived, Seiter administered field sobriety tests. Seiter stated that he did not present this as an option.

{¶ 11} When Adams exited the cruiser, he had no difficulty doing so. Seiter first administered the horizontal gaze nystagmus ("HGN") test. He believed this was the most accurate of the field sobriety tests. In the HGN test, an officer holds a stimulus, (generally a pen) twelve to fifteen inches away from an individual's face, and the individual is directed to follow the stimulus with his or her eyes. Alcohol is indicated if the eyes have a lack of smooth pursuit, i.e., do not follow the stimulus or bounce around. The second part of the test measures sustained nystagmus at maximum deviation, and the third is onset prior to 45 degrees. These latter tests also use a stimulus and the presence of alcohol is indicated if the eyes bounce around or if there is involuntary jerking of the eyes.

{¶ 12} The sobriety tests were not captured on video, although audio can be heard. Before administering the test, Seiter asked Adams to remove his glasses, per the NHTSA

manual, because glasses can get glare from light. Seiter noted that Adams' pupils were equal in size and that his eyes tracked equally. After administering the test, Seiter observed one or two clues, whereas an individual must exhibit four clues for an indication that the alcohol blood level is over .10.

**{¶ 13}** At the suppression hearing, Seiter indicated that he felt that Adams was attempting to lead the pen, and that hampered administration of the test. His opinion was that Adams was cheating on the test. He did not say this on the video, however. Furthermore, Seiter stated at the suppression hearing that he believed after completion of the first HGN test that Adams was "fine to go." Transcript of Proceedings, Vol. I, p. 120. On the cruiser video, Seiter also stated that "you're not over. Your eyes aren't giving me any indication."

**{¶ 14}** During the suppression hearing the following exchange occurred:

Q: * * * [I]f you conduct the test twice and you do it correctly twice would you anticipate that the time that you took to do the two HGN's [sic] on Mr. Adams to be the same?

A. No.

Q. No? Why would they be different?

A. Because of the first one not being correct.

Q. Why wasn't the first one correct?

A. With the anticipating of the pen[,] the stimulus.

Q. Anticipating?

A. And the stimulus and I had to actually tell him to hold his head still.

Q. That's not actually a clue in the NHTSA manual is it?

A. No it's not.

* * *

Q. * * * [W]ell what did you say to him? After you did the HGN for the first time, in your opinion correctly, what did you say to him?

A. I actually said I think you're ok to drive.

Q. And why is that?

A. Because I was not getting any clues from his HGN to begin with because he was shorting or anticipating.

* * *

Q. * * * So you were going to let him go at that point?

A. Well I was [sic] actually had him blow into the PBT because I wanted to make sure that the alcohol that was emitting from him was either from his clothes or from his breath.

Q. Why wouldn't you have known that at that point? He's been in front of you for almost twenty minutes at this point.

A. Because it's actually hard to distinguish.

Q. Whether it's on his clothes or on his breath.

A. Yes.

Q. So you have not witnessed enough clues and you said two and you said no clues but we can agree that it's not enough for the arrest point – for the decision point at this point?

A. That would be correct.

Q.   Do you remember what you said to him then?

A.   I said I don't think you've had enough to – you're ok to drive or something similar to that effect.

**Video is being played**.

Q.   That was it?

A.   I don't think you've had too much to drink.

**Video is stopped**.

Q.   Do you agree with me that what you said was, I don't really think you've had too much to drink and drive so I'm gonna probably – or too much to drive excuse me so I'm gonna let you go with a warning, ok?

A.   Yes.

Q.   That's what you said?   Now if he was cheating in your opinion, on the HGN why would you say that?   Why wouldn't you get him back in the position and make him do the HGN right?

A.   That's a good question.

THE STATE:   I'm going to object your Honor.   That's two questions there.

THE COURT:   Yeah, Ask one question at a time.

Q.   Was it your opinion that Mr. Adams was cheating on the test?

A.   Yes it was.

Q.   Did you tell him that on the video?

A.   I had him – I did not say you're cheating.   I had him continuously

say about four times to follow the pen and hold your head still.[2]

Q.   And in your opinion at this point your testimony is that you were unsatisfied with his performance on that test or unsatisfied with the way that you conducted it?   You said that there was something wrong with it?

A.   Yes.

Q.   But at this point you told him you think he's ok to drive and you're gonna let him go with a warning?   Why would you do that if the HGN had gone so foully the first time?

A.   I have no reasonable logical answer for that.

Transcript of Proceedings, Vol. I, pp. 112-115.

{¶ 15} After telling Adams this, Seiter had Adams blow into a portable breath machine ("PBT").   During the hearing, the following discussion occurred on this issue:

**Video is being played**

Q.   Did you hear yourself just say I'm gonna show you where you are at because you're not over?

**Video stopped**

A.   Yeah.

Q.   And you mean that with the portable breath test, right?

---

[2] The cruiser video indicates that Officer Seiter gave Adams general instructions before beginning the test about how to perform it, including that Adams should follow the pen and keep his head still.   After that, Seiter made three (not four) comments at different times (and not continuously) during the test, which lasted about a minute and a half. These brief comments were: "Go ahead and follow it,"   "Just focus on tip of that pen," and "All the way out there.   Follow it with the eyes."   These appear to be nothing more than routine instructions, and Seiter never told Adams again to keep his head still.   The audio reveals no indication during or after the test that Seiter was dissatisfied with Adams' compliance.

A.  Yes.

**<u>Video is being played</u>**

Q.  Did you hear yourself say you will have some in your system but your eyes aren't giving me any indication?

A.  Yes.

**<u>Video stopped</u>**

Q.  I'm just letting you know where you're at?

A.  Yes.

* * *

Q.  Is there a difference between a couple of clues and I'm not seeing anything in your eyes?

A.  Yes, there is.

Q.  Ok[.]  What's the difference between a couple of clues and I'm not seeing anything in your eyes?

A.  You either is or you [sic] ain't.

* * *

Q.  Again none of this is included in your report right?  None of it you testified to on direct that your eyes aren't giving me any indication?

A.  Correct (inaudible).

Q.  OK and then based on this apparently on him not exhibiting any clues[,] I mean I'm just going off what you said here[,] you got the portable out just to give him an idea of where he was.

A.  Yes.

Q.  Believing that he was fine to go?

A.  Yes.

Transcript of Proceedings, Vol. I, pp. 117-120.

**{¶ 16}** The PBT showed a reading of .136.   At that point, Seiter administered a second HGN test, this time with Adams wearing his glasses, and observed all six clues on the HGN.   Seiter also administered the walk-and-turn test, during which Adams exhibited four clues, including counting ten steps rather than nine.   In addition, Seiter administered the one-legged stand, during which Adams did not exhibit any clues. Following the conclusion of the field sobriety tests, Seiter told Adams he was under arrest for OVI and handcuffed him.   Seiter then told Adams that he would offer him a breath test or he would obtain a warrant for a blood test because this was a no-refusal checkpoint.   This differed from normal OVI procedure, pursuant to which the police would not obtain a warrant unless criteria existed for a felony OVI.   Instead, if a person refused a breath test, the person would be placed under immediate suspension.

**{¶ 17}** After placing Adams under arrest, Seiter transported Adams to the Safety Building, where the BAC Data Master, a breathalyzer machine, was located.   Upon being tested there, Adams' blood alcohol level registered at .132.   Adams was then charged with a violation of Section 71.50 of the Dayton Code of Ordinances (speeding), OVI in violation of R.C. 4511.19(A)(1)(a), and OVI in violation of R.C. 4511.19(A)(1)(d).

**{¶ 18}** In September 2014, Adams filed a motion to suppress evidence, and the court held a hearing on the motion in February 2014, at which the above evidence was elicited.   In January 2016, the trial court filed a decision overruling the motion to suppress.   Following the decision, the State filed a motion in limine, asking the court to

prohibit Adams from presenting any evidence at trial of his impairment or lack of impairment. In the motion, the State indicated it would dismiss the R.C. 4511.19(A)(1)(a) (impairment) charge and proceed at trial only on the "per se" R.C. 4511.19(A)(1)(d) charge.

{¶ 19} The trial court did not file an entry granting the motion in limine, but the trial transcript indicates that the court had granted the motion. After a jury trial, the jury found Adams guilty of the R.C. 4511.19(A)(1)(d) charge, and the court found Adams guilty of the speeding violation. The court then sentenced Adams to 180 days in jail, with 170 days suspended, basic supervision for two years, a one-year driver's license suspension, fines, and an alcohol and drug assessment. However, the court stayed the sentence pending appeal. Adams timely appealed from his convictions and sentences.

## II. The Basis for Imposing Field Sobriety Testing

{¶ 20} Adams' assignments of error are directed to the denial of his motion to suppress and the grant of the State's motion in limine, rather than the jury verdict. His First Assignment of Error states that:

> The Trial Court Erred in Finding that a Reasonable Articulable Suspicion Existed for the Imposition of Field Sobriety Testing.

{¶ 21} In denying Adams' motion to suppress, the trial court first concluded that Officer Seiter had a reasonable suspicion for imposing the first field sobriety test. In particular, the court relied on the traffic violation (albeit minor), and the totality of circumstances once Seiter made contact with Adams. Adams argues that the circumstances did not provide a basis for stopping him and imposing a sobriety test.

{¶ 22} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted). *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.*

{¶ 23} Both Article I, Section 14 of the Ohio Constitution and the Fourth Amendment to the United States Constitution prohibit "unreasonable searches and seizures." *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001). However, "a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime." (Citations omitted.) *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7. In viewing the propriety of investigative stops, courts consider the " 'totality of the surrounding circumstances.' " *Id.*, quoting *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980), paragraph one of the syllabus.

{¶ 24} "[A] police officer who lacks probable cause but whose observations lead him reasonably to suspect that a particular person's behavior is criminal may detain the person briefly to investigate the circumstances that provoked the suspicion." (Citation omitted.) *Mays* at ¶ 13. However, "the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' " *United States v. Brignoni-Ponce*, 422 U.S.

873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), quoting *Terry v. Ohio*, 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶ 25} In the case before us, Adams was stopped for an alleged speeding violation and was charged with that crime. Seiter testified that the speed limit on Steve Whalen Boulevard was 45 miles per hour, and that, while pacing Adams and using stationary radar, he determined that Adams drove 55 miles per hour for a few seconds and then maintained a steady pace of 52 miles per hour for about a quarter of a mile. Adams was traveling in excess of the posted speed limit, and Seiter was justified in stopping Adams to issue a citation. *See State v. Santiago*, 195 Ohio App.3d 649, 2011-Ohio-5292, 961 N.E.2d 264, ¶ 10 (2d Dist.).

{¶ 26} In *Santiago*, we noted that while the defendant had been properly stopped for a traffic violation, that "did not necessarily give the officer the right to subject [him] to the further intrusion represented by the administration of field sobriety tests; the officer had to have a reasonable, articulable suspicion that [the defendant] was driving the vehicle while under the influence in order to justify the administration of field sobriety tests." *Id.* at ¶ 11, citing *State v. Spillers*, 2d Dist. Darke No. 1504, 2000 WL 299550 (Mar. 24, 2000), and *State v. Hido*, 2d Dist. Clark No. 10-CA-46, 2011-Ohio-2560, ¶ 9. We stressed that these situations are " 'very fact-intensive.' " (Citation omitted.) *Santiago* at ¶ 13. Furthermore, the "circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." (Citations omitted.) *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

{¶ 27} The trial court reviewed the totality of circumstances and concluded that

Seiter had a reasonable suspicion for conducting the first sobriety test. Among the factors the court cited were: 1) the time of day; (2) the fact that Adams was speeding; (3) Adams' odor of alcohol, his "flush" face, and glassy eyes; and (4) Adams' trouble with his insurance card and admission of having earlier consumed beer. In arguing that the trial court's decision was incorrect, Adams relies on prior authority from our district indicating that a slight odor of alcohol, minor traffic infractions, and admitting to having had one or two beers are not sufficient reasons to intrude on an individual's liberty.

{¶ 28} *Spillers* is one of the cases cited by Adams. In that case, we did state that:

[W]e conclude that traffic violations of a de minimis nature are not sufficient, combined with a slight odor of an alcoholic beverage, and an admission to having consumed "a couple" of beers, to support a reasonable and articulable suspicion of Driving Under the Influence. Few of us drive any appreciable distance without committing traffic violations that could properly be characterized as "de minimis." By themselves, then, traffic violations of a de minimis nature are not indicative of impaired driving. Otherwise, virtually every motorist could reasonably be suspected of impaired driving, since virtually every motorist, driving a distance of several miles, will fail to signal a lane change; touch, or even slightly cross, a line marking a lane; or exceed the speed limit slightly. Furthermore, a slight odor of an alcoholic beverage, without more, is not indicative of impaired driving. The law prohibits driving under the influence of alcohol; it does not prohibit driving after the mere consumption of an alcoholic beverage.

*Spillers*, 2d Dist. Darke No. 1504, 2000 WL 299550, at *3, citing *State v. Taylor*, 3 Ohio

App.3d 197,198, 444 N.E.2d 481 (1st Dist.1981).

{¶ 29} We have subsequently distinguished *Spillers* in a variety of situations. For example, in *Santiago*, we found that the officer had a reasonable, articulable suspicion based on "[t]he odor of an alcoholic beverage emanating from [the defendant's] vehicle, the bottle of alcohol visible within the vehicle, [defendant's] tired and glassy eyes, his traffic violation and suspicious behavior in pulling off the road two times, and his somewhat uncooperative attitude toward [the police officer] * * *." *Santiago*, 195 Ohio App.3d 649, 2011-Ohio-5292, 961 N.E.2d 264, at ¶ 15. We also noted that after the defendant exited the vehicle, the officer was able to conclude that the defendant, independent of the car or any occupant, smelled of alcohol. *Id.* *See also, e.g.*, *State v. Gladman*, 2d Dist. Clark No. 2013-CA-99, 2014-Ohio-2554, ¶ 15, and *State v. Criswell*, 162 Ohio App.3d 391, 2005-Ohio-3876, 833 N.E.2d 786, ¶ 9 (2d Dist.) (both finding *Spillers* factually distinguishable).

{¶ 30} In the case before us, Officer Seiter's testimony was challenged on several points, including his failure to mention anything about "glassy" eyes in the initial impaired driver report; his contention that sober drivers tend to not look straight ahead; and his equation of a "little bit" of alcohol smell with a "moderate" alcohol smell. Nonetheless, Seiter did smell an increased amount of alcohol when Adams was sitting in the cruiser, away from the car and cigarette odor, and the trial court, as the trier of fact, apparently believed Seiter's testimony about Adams' eyes. We have often stressed that for purposes of motions to suppress, "the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d

Dist.1994); *State v. Curley*, 2016-Ohio-7624, 73 N.E.3d 1050, ¶ 9 (2d Dist.).

{¶ 31} Adams also cites *State v. Evans*, 127 Ohio App.3d 56, 711 N.E.2d 761 (11th Dist.1998), and contends that under the factors applied in *Evans,* Seiter was not justified in deciding to administer the first sobriety test. In *Evans*, the court listed the following factors as pertinent to an officer's decision to conduct roadside sobriety tests:

(1) the time and day of the stop (Friday or Saturday night as opposed to, *e.g.*, Tuesday morning); (2) the location of the stop (whether near establishments selling alcohol); (3) any indicia of erratic driving before the stop that may indicate a lack of coordination (speeding, weaving, unusual braking, etc.); (4) whether there is a cognizable report that the driver may be intoxicated; (5) the condition of the suspect's eyes (bloodshot, glassy, glazed, etc.); (6) impairments of the suspect's ability to speak (slurred speech, overly deliberate speech, etc.); (7) the odor of alcohol coming from the interior of the car, or, more significantly, on the suspect's person or breath; (8) the intensity of that odor, as described by the officer ("very strong," "strong," "moderate," "slight," etc.); (9) the suspect's demeanor (belligerent, uncooperative, etc.); (10) any actions by the suspect after the stop that might indicate a lack of coordination (dropping keys, falling over, fumbling for a wallet, etc.); and (11) the suspect's admission of alcohol consumption, the number of drinks had, and the amount of time in which they were consumed, if given. All of these factors, together with the officer's previous experience in dealing with drunken drivers, may be taken into account by a reviewing court in determining whether the officer acted

reasonably. No single factor is determinative.

*Evans* at 63, fn.2.

**{¶ 32}** Some courts have criticized the *Evans* factors because they were adopted before Ohio reduced the alcohol level required for violations; as a result, drivers may not display some factors if they are impaired at a lower level. *See State v. Burkhart*, 2016-Ohio-7534, 64 N.E.3d 1004, ¶ 24 (4th Dist.), citing *City of Cleveland v. Machnics*, 984 N.E.2d 1129, 1132 (M.C.2012).

**{¶ 33}** We need not decide this issue. Although we have cited *Evans* on a few occasions, we have not specifically adopted its factors for use in our suppression decisions. *See, e.g., State v. Morris*, 2d Dist. Greene No. 09-CA-84, 2010-Ohio-3352, ¶ 9. As was noted, suppression cases are very fact-intensive, and we review the totality of the circumstances. *Santiago*, 195 Ohio App.3d 649, 2011-Ohio-5292, 961 N.E.2d 264, at ¶ 13. Furthermore, we have "repeatedly held that a strong odor of alcohol alone is sufficient to provide an officer with reasonable suspicion of criminal behavior." (Citations omitted.) *State v. Tackett*, 2d Dist. Greene No. 2011-CA-15, 2011-Ohio-6711, ¶ 13. While the case before us did not involve a strong odor of alcohol, the point is that we have not required any specific number of indicators, nor have we adopted a balancing test.

**{¶ 34}** Accordingly, we cannot find that the trial court erred in concluding that Officer Seiter had a reasonable, articulable suspicion justifying the first sobriety test. Notably, our conclusion at this point pertains only to the initial decision to detain Adams and administer the first sobriety test. In discussing the second assignment of error, Adams argues that when Seiter imposed a PBT, he had lost any reasonable, articulable

suspicion because Adams had passed a NHTSA-sanctioned field sobriety test that is considered almost 90% accurate. Adams, therefore, maintains that detaining him to impose the PBT was illegal.

**{¶ 35}** The trial court noted Adams' contention that " 'Despite Officer Seiter observing no HGN clues in round one, after Adams blew over on the portable test, Officer Seiter had decided he was going to arrest Adams and was willing to fabricate the results of a second HGN test in order to support that test.' " January 22, 2016 Decision and Entry, p. 5, quoting Defendant's Memorandum, p. 18. In responding to this contention, the trial court commented that:

> The Court after listening to all the testimony of Officer Seiter and a review of the videotape is unwilling to find for purposes of a suppression hearing that Officer Seiter lied to the Court in his testimony. Rather the Court notes that the first HGN test did not show enough clues but that Officer Seiter thought the Defendant was not following his instructions. As a result Officer Seiter asked Defendant to blow into a PBT which the Defendant did resulting in a .136 score. The Court finds that Defendant was not forced nor coerced to blow into the PBT by Officer Seiter. Given the result of the PBT, Officer Seiter decided to re-administer the HGN, this time with Defendant's glasses on which is not as the NHTSA manual instructs due to possible glare from the glasses. Officer Seiter testified that during the second HG test there was no glare from Defendant's glasses leading to his observance of six clues of impairment.

*Id.* at pp. 5-6.

{¶ 36} This is a troubling case. As was noted, we normally defer to trial court decisions on credibility. However, Officer Seiter's testimony at the suppression hearing clearly and completely contradicts his statements memorialized by the video at the time of the incident. As a result, this is the rare instance when we must disagree with the trial court, and conclude that any further detention of Adams was illegal.

{¶ 37} While trial courts are in the best position to evaluate credibility, we are only required to accept a trial court's findings of fact "if they are supported by competent, credible evidence." *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8. Here, the trial court's findings are not supported by such evidence. Officer Seiter specifically told Adams that he was going to let him go with a warning because he was okay to drive, was not over the limit, and was fine to go. At the hearing, Seiter admitted he had no reasonable or logical explanation for why he made those statements, if, indeed, a problem existed. The video tape is clearly more compelling than Seiter's contradictory memory of the events.

{¶ 38} As support for the trial court's decision, the State focuses on Seiter's testimony that the first HGN test was not correct because Adams would not hold still and "anticipated" or "jumped ahead" of where Seiter moved the stimulus. This completely contradicts the video evidence of what actually occurred at the time. If Seiter truly believed that Adams had improperly performed the HGN test, he probably would not have told Adams that he was not over the OVI limit, and that he was fine to go.

{¶ 39} For clarification, we are not suggesting that an officer is required to release an OVI suspect if the person passes one or more field sobriety tests. However, when an officer informs a suspect that he or she passed one or more sobriety tests and is free or

fine to go, this will generally terminate the lawful detention absent the discovery of additional evidence of impairment or other criminal activity sufficient to support a reasonable articulable suspicion.

{¶ 40} In *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762 (1997), the Supreme Court of Ohio held that:

> When a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure.

*Id.* at paragraph one of the syllabus.

{¶ 41} As was noted, the record in this case is devoid of objective justification to continue Adams' detention after he was told he passed the HGN test and was free or fine to go, and he, therefore, was unlawfully seized. As in the present case, the defendant in *Robinette* was initially lawfully stopped (for speeding), but was then unlawfully detained because the continued detention and request to search was not based on reasonable, articulable facts giving rise to a suspicion of illegal activity. *Robinette* at 241.[3] This does not mean that police cannot ask for consent to search; it simply means that the consent to search must be truly voluntary where no reasonable cause exists for continued

---

[3] In *Robinette*, the court found that the officer could permissibly ask the defendant if he had contraband in his car, based on a drug interdiction policy, which promoted "public interest in quelling the drug trade." *Robinette*, 80 Ohio St.3d at 240, 685 N.E.2d 762. However, the court then concluded that the officer's further request to search the vehicle was not appropriate, absent objective justification. *Id.* at 234 and 240-241.

detention.

{¶ 42} Specifically, "[o]nce an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave."  *Robinette* at paragraph two of the syllabus.

{¶ 43} " '[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied.  Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent' "  *Robinette*, 80 Ohio St.3d at 242-243, 685 N.E.2d 762, quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).  *Accord State v. White*, 2013-Ohio-3027, 995 N.E.2d 930, ¶ 22 (2d Dist.)

{¶ 44} "[W]hen a person offers consent to a search during an unlawful police detention, the state must meet a more stringent standard in determining whether the consent was freely and voluntarily given."  *State v. Scarberry*, 2016-Ohio-7065, 72 N.E.3d 173, ¶ 20 (10th Dist.), citing *State v. Limoli*, 10th Dist. Franklin No. 11AP-924, 2012-Ohio-4502, ¶ 23.  " '[W] here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was *freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a*

*claim of lawful authority.*' " (Emphasis sic.) *Robinette* at 243, 685 N.E.2d 762, quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

**{¶ 45}** In *Robinette*, the court commented that "[t]he timing of [the officer's] immediate transition from giving [the defendant] the warning for speeding into questioning regarding contraband and the request to search is troubling." *Id.* at 244. The court further stated that:

> "The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow." *Id.*, [*State v. Robinette*,] 73 Ohio St.3d [650] at 654, 653 N.E.2d at 698 [1995].
>
> When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. While [the officer's] questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive.

(Footnote omitted.) *Robinette*, 80 Ohio St.3d at 244-245, 685 N.E.2d 762.

**{¶ 46}** Accordingly, the Supreme Court of Ohio concluded that "[f]rom the totality of the circumstances, it appears that [the defendant] merely submitted to 'a claim of lawful authority' rather than consenting as a voluntary act of free will. Under *Royer*, this is not sufficient to prove voluntary compliance." *Id.* at 245, quoting *Royer* at 497.

**{¶ 47}** Various districts, including our own, have stated that "[w]hen consent is

obtained after illegal police activity, ' "[t]he consent will be held voluntary only if there is proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of the prior illegal action." ' " *Scarberry*, 2016-Ohio-7065, 72 N.E.3d 173, at ¶ 20, quoting *State v. Alihassan*, 10th Dist. Franklin No. 11AP-578, 2012-Ohio-825, ¶ 26, which in turn quotes *Retherford*, 93 Ohio App.3d at 602, 639 N.E.2d 498. (Other citation omitted.). *See also State v. Wildman*, 185 Ohio App.3d 346, 2009-Ohio-6986, 923 N.E.2d 1240, ¶ 21 (6th Dist.), *limited on other grounds*, *State v. Kubat*, 6th Dist. Sandusky No. S-13-046, 2015-Ohio-4062, ¶ 18-22; *State v. Henderson*, 11th Dist. Lake No. 2006-L-110, 2007-Ohio-2315, ¶ 46; *State v. Simmons*, 4th Dist. Highland No. 05CA4, 2006-Ohio-953, ¶ 50-51 and fn.2; *State v. Doane*, 1st Dist. Hamilton No. C-040523, 2005-Ohio-2740, ¶ 16.

**{¶ 48}** "Factors to consider in determining whether the consent is sufficiently removed from the taint of the illegal police activity include the length of time between the illegal activity and the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct." *Alihassan* at ¶ 26, citing *United States v. Richardson*, 949 F.2d 851, 858 (6th Cir.1991). (Other citations omitted.) *Accord Scarberry* at ¶ 20; *Doane* at ¶ 16; *Wildman* at ¶ 21; *Retherford* at 602; *Henderson* at ¶ 46.

**{¶ 49}** In the case before us, it is questionable whether Officer Seiter even asked for consent.[4] Assuming for the sake of argument that Adams impliedly consented by taking the PBT, the issue would be whether Adams' consent was voluntary under the standards set forth above. The trial court briefly stated that Adams' consent was

---

[4] R.C. 4511.191(A)(2), the implied consent statute, does not apply because at the point in time the PBT was administered, Adams had not been arrested for a violation of R.C. 4511.19.

voluntary (without providing any reasoning), but the court had also found that Adams' continued detention was proper. We have rejected that finding as unsupported by the evidence. As a result, the trial court did not apply the above standards, which relate to the issue of voluntary consent following unlawful continued detention. Because the trial court did not consider this question, the case must be remanded for a decision on whether Adams consented, and if so, whether his consent was voluntary. *See*, *e.g.*, *Simmons*, 4th Dist. Highland No. 05CA4, 2006-Ohio-953, at ¶ 52 (noting that an appellate court should not intrude on the trial court's domain, where the trial court did not consider an issue).

**{¶ 50}** Accordingly, we conclude that the trial court erred in overruling Adams' motion to suppress, insofar as the motion related to Adams' contention that he was unlawfully detained after the first field sobriety tests. However, the issue of whether Adams voluntarily consented to the PBT test following his unlawful continued detention must be considered by the trial court, in the first instance, on remand.

**{¶ 51}** Based on the preceding discussion, the First Assignment of Error is sustained. The trial court's judgment will be reversed and this cause will be remanded for further proceedings consistent with this opinion.

III. Alleged Prejudice by Officer's Less than Strict

Compliance with NHTSA manual.

**{¶ 52}** Adams' Second Assignment of Error states that:

Officer Seiter's Second HGN Was Not Conducted in Strict

Compliance with the 2013 NHTSA Manual and Adams Was Prejudiced by

Less than Strict Compliance on the Second HGN.

{¶ 53} Under this assignment of error, Adams concedes that administration of field sobriety tests must only substantially comply with the NHTSA manual, but argues that he was nonetheless prejudiced. During the second HGN examination, Officer Seiter instructed Adams to wear his glasses, which violated the instructions in the NHTSA manual.[5] According to Adams, he was prejudiced by Seiter's failure to comply with the manual because the presence of Adams' glasses was the only difference between the two tests.

{¶ 54} Adams contends that even if one assumes that Officer Seiter allowed him to "cheat" on the first HGN test, while Seiter witnessed few or no clues, Seiter was somehow "amazingly" able to detect all six clues during the second test. In both tests, however, Seiter otherwise complied with the NHTSA manual. According to Adams, "substantial compliance" should be measured by the degree of corrupting effect an officer's actions cause, rather than by how complete the officer's required actions may be.

{¶ 55} Because the First Assignment of Error was sustained, this assignment of error is moot and need not be considered. Accordingly, the Second Assignment of Error is overruled as moot.


IV. The Existence of Probable Cause for an Arrest

{¶ 56} Adams' Third Assignment of Error is as follows:

The Trial Court Erred in Finding that Probable Cause Existed to

---

[5] The manual at issue is the 2013 NHTSA manual. As noted, the trial court took judicial notice of this manual.

Arrest Adams.

{¶ 57} Under this assignment of error, Adams contends that the trial court erred in finding that Officer Seiter had probable cause for an arrest. The court made this observation in a one-line sentence at page 6 of its January 22, 2016 Decision and Entry, but did not elaborate further.

{¶ 58} This assignment of error is based on the lack of evidence of probable cause if the results of the failing field sobriety tests and the PBT are excluded. For the reasons previously discussed, this assignment of error is moot and will not be considered. The Third Assignment of Error, therefore, is overruled as moot.

## V. The Police Officer's Alleged Misrepresentation of Law

{¶ 59} Adams' Fourth Assignment of Error states that:

The Trial Court Erred by Finding that Officer Seiter's Misrepresentations of the Law to Adams Did Not Render His Breath Sample Involuntarily Imposed and Constitutionally Deficient.

{¶ 60} This assignment of error is based on Officer Seiter's statement to Adams that "you've had refusals in the past but you are not gonna refuse tonight because I'm gonna get a warrant because this is a no refusal checkpoint that we are running tonight." Transcript of Proceedings, Vol. I, p. 123. The trial court concluded that even if Seiter " 'had misstated the law about the consequences of refusing a chemical test, the Defendant's remedy would be dismissal of his ALS, not suppression of his breath test.' " January 22, 2016 Decision and Entry, p.7, quoting the State's memorandum. In addition, the trial court concluded that Seiter did not use coercion or trickery in connection with this

particular issue.

**{¶ 61}** Again, given that the trial court erred in denying the motion to suppress with respect to the unlawful detention, this assignment of error is moot and will not be addressed. Accordingly, the Fourth Assignment of Error is overruled as moot.

## VI. Alleged Error in Granting the State's Motion in Limine

**{¶ 62}** Adams's Fifth Assignment of Error states as follows:

The Trial Court Erred in Granting the State's Motion in Limine

**{¶ 63}** Under this assignment of error, Adams contends that the trial court should have overruled the State's motion in limine, which asked that Adams be precluded from presenting any evidence at trial about his impairment or lack of impairment. This motion was based on the State's election to try Adams only on the per se charge involving R.C. 4511.19(A)(1)(d), rather than on the R.C. 4511.19(A)(1)(a) charge, which would have required proof of impairment. According to Adams, the State's motive was to prevent the jury from hearing evidence of alleged fabrication in connection with the HGN testing.

**{¶ 64}** Adams argues that NHTSA field testing correlates to blood alcohol content, not impairment, and that he should have been permitted to present evidence on the first HGN test to challenge the accuracy of the breathalyzer results. This assignment of error is moot, based on our decision to sustain the First Assignment of Error. Accordingly, the Fifth Assignment of Error is overruled as moot.

## VII. Conclusion

**{¶ 65}** Adams' First Assignment of Error having been sustained, and the remaining

assignments of error having been overruled as moot, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

HALL, P.J. and FROELICH, J., concur.

Copies mailed to:

Matthew Kortjohn
Brock Schoenlein
Hon. Daniel G. Gehres