[Cite as *State v. Aicher*, 2018-Ohio-1866.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO      :
          :
 *Plaintiff-Appellee*   : Appellate Case No. 27570
          :
v.         : Trial Court Case Nos. 2016-TRC-6617
          : and 2016-CRB-1842
JOHN F. AICHER    :
          : (Criminal Appeal from Municipal Court)
 *Defendant-Appellant*  :
          :

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of May, 2018.

. . . . . . . . . . .

NOLAN C. THOMAS, Atty. Reg. No. 0078255, City of Kettering Prosecuting Attorney, 2325 Wilmington Pike, Kettering, Ohio 45420
  Attorney for Plaintiff-Appellee

BROCK A. SCHOENLEIN, Atty. Reg. No. 0084707, 371 West First Street, Dayton, Ohio 45402
  Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-appellant, John F. Aicher, appeals from the decision of the Kettering Municipal Court overruling his motion to suppress evidence flowing from field sobriety tests and a breath sample taken following a traffic stop for expired license plates. In support of his appeal, Aicher contends that the officer on duty lacked a reasonable, articulable suspicion that he was driving under the influence of alcohol to justify performing field sobriety tests. Aicher also contends that the breath sample he provided was not tested in compliance with the Ohio Department of Health's regulations and therefore should not have been deemed admissible for trial. For the following reasons, the judgment of the trial court will be affirmed.

### Facts and Course of Proceedings

{¶ 2} On August 6, 2016, Aicher was arrested and charged with two counts of operating a vehicle while under the influence of alcohol ("OVI") in violation of R.C. 4511.19(A)(1)(a) and R.C. 4511.19(A)(1)(d). Aicher was also charged with improper display of license plates in violation of Kettering Local Ordinance 436.09, possession of drug paraphernalia in violation of R.C. 2925.14, and possession of an open container in violation of R.C. 4301.62. The charges arose after Aicher was pulled over by Officer Bradley Lambert of the Kettering Police Department for driving with expired license plates. The traffic stop expanded into an OVI investigation after Lambert made certain observations that led him to believe Aicher was driving under the influence of alcohol. After conducting various field sobriety tests, Lambert arrested Aicher for driving under the influence and conducted an inventory search of Aicher's vehicle. During the inventory

search, Lambert discovered an open container of alcohol and drug paraphernalia. Aicher later submitted to an alcohol breath test that confirmed he had been operating his vehicle while over the legal limit.

{¶ 3} Following his arrest, Aicher pled not guilty to all the charges. Thereafter, Aicher filed a motion to suppress the evidence flowing from the field sobriety tests and his breath sample. In support of his motion, Aicher argued that he was unlawfully detained during the field sobriety tests because Officer Lambert did not have a reasonable, articulable suspicion to believe that he was driving under the influence of alcohol. Aicher also argued that his breath sample was inadmissible because it was not tested in compliance with the Ohio Department of Health's regulations.

{¶ 4} On December 14, 2016, the trial court held a hearing on Aicher's motion to suppress. At the hearing, Officer Lambert testified that he has been a Kettering police officer for over 15 years and that he has made over 300 OVI arrests during his tenure as an officer. Lambert also indicated that he received alcohol detection training based on National Highway Traffic Safety Administration ("NHTSA") standards while he was at the Ohio State Basic Peace Officer Training Academy. Lambert further testified that he has since received regular updates on his training by attending drug and alcohol recognition courses through Advanced Roadside Impaired Driving Enforcement ("ARIDE") and Alcohol Detection and Prosecution ("ADAP").

{¶ 5} Regarding the incident in question, Officer Lambert testified that at 1:05 a.m. on August 6, 2016, he observed a gray Volkswagen with expired license plates driving near the intersection of Wilmington Pike and Ansel Drive in Kettering, Ohio. Lambert testified that he conducted a traffic stop based on the expired plates and made contact

with the driver, later identified as Aicher. Upon approaching Aicher and speaking with him, Lambert testified that he smelled "a moderate odor of an alcohol beverage upon [Aicher's] breath as he would speak." Suppression Hearing Trans. (Dec. 14, 2016), p. 53. Lambert also testified that he detected a faint odor of burnt marijuana and noticed that Aicher's eyes were glassy and that some of his words "would become a little bit slurred at times." Id. Lambert further testified that Aicher informed him that he was coming from the Oregon District, which he explained is a bar district in downtown Dayton. Lambert also testified that Aicher admitted to having "a couple" alcoholic beverages to drink that night. Id. at p. 54.

{¶ 6} Based on these observations, Officer Lambert expanded the scope of the traffic stop to perform field sobriety testing. According to Lambert, Aicher's performance on the field sobriety tests confirmed his belief that Aicher was driving under the influence of alcohol. As a result, Lambert testified that he arrested Aicher at 1:22 a.m. Following Aicher's arrest, Lambert testified that he and the other officer on duty, Officer Spinks, performed an inventory search of Aicher's vehicle, which yielded an open flask containing a small amount of whiskey and a "one hitter" pipe that contained marijuana residue.

{¶ 7} Continuing, Officer Lambert testified that Aicher was transported to jail by Officer Spinks and that Lambert made contact with Aicher at the jail approximately 20 minutes later. Lambert testified that Aicher was placed in a holding cell and was monitored by jailer Peter Morris prior to his arrival. Lambert testified that when he made contact with Aicher in jail, Aicher agreed to take a breath test, which Lambert performed at 2:07 a.m.

{¶ 8} With regard to the breath test, Officer Lambert testified that he was certified

by the Ohio Department of Health to perform breath tests using an Intoxilyzer 8000. Lambert testified that the Intoxilyzer 8000 used to test Aicher was in proper working condition at the time he conducted the test. Specifically, Lambert testified that the Intoxilyzer 8000 conducts internal checks and that it would not have performed the breath test on Aicher had it not been working properly. Lambert testified that the results of the breath test showed that Aicher's breath alcohol content was 0.16 grams of alcohol per 210 liters of breath, an amount that is twice the legal limit.

{¶ 9} In addition to Officer Lambert's testimony, the State presented testimony from Ohio Department of Health inspector Robert Norbeck. Norbeck testified that on September 9, 2015, he certified the Intoxilyzer 8000 that was used to test Aicher's breath sample. Norbeck thereafter explained the certification process in detail and further testified that all of the tests he performed on the Intoxilyzer 8000 indicated that the instrument was in proper working condition and was in compliance with the Ohio Department of Health's regulations. Norbeck also confirmed that the Intoxilyzer 8000 was working properly on the day of Aicher's breath test. Norbeck also identified various documents and test reports confirming his testimony that the instrument was properly certified and in working order.

{¶ 10} Following the suppression hearing, the trial court issued a written decision overruling Aicher's motion to suppress. In so holding, the trial court found that the State provided sufficient evidence that the Intoxilyzer 8000 at issue met all of the Ohio Department of Health's regulations to provide an admissible breath sample. The trial court further found that Lambert's observations of Aicher during the traffic stop provided Lambert with a reasonable, articulable suspicion that Aicher was driving under the

influence of alcohol to justify performing field sobriety tests.

{¶ 11} After his motion to suppress was overruled, Aicher entered a no contest plea to all the charges against him. The trial court then accepted Aicher's plea and found him guilty as charged. At sentencing, the trial court merged the two OVI offenses and sentenced Aicher to 180 days in jail with 176 days suspended. The trial court also imposed a $1,000 fine with $600 suspended, suspended his driver's license for 90 days, and placed him on two years of probation. The trial court further ordered Aicher to pay a $10 fine for improper display of license plates, a $25 fine for possessing an open container, and a $25 fine for possessing drug paraphernalia.

{¶ 12} Aicher now appeals from the trial court's decision overruling his motion to suppress, raising two assignments of error for review.

## Standard of Review

{¶ 13} "In ruling on a motion to suppress, the trial court 'assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' " *State v. Prater*, 2012-Ohio-5105, 984 N.E.2d 36, ¶ 7 (2d Dist.), quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "As a result, when we review suppression decisions, 'we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.' " *Id.*, quoting *Retherford*.

**First Assignment of Error**

**{¶ 14}** Aicher's First Assignment of Error is as follows:

THE TRIAL COURT ERRED IN FINDING THAT A REASONABLE ARTICULABLE SUSPICION OF IMPAIRED DRIVING EXISTED FOR THE IMPOSITION OF FIELD SOBRIETY TESTING.

**{¶ 15}** Under his First Assignment of Error, Aicher contends that in overruling his motion to suppress the trial court erroneously concluded that Officer Lambert had a reasonable, articulable suspicion that he was driving under the influence of alcohol to justify prolonging the traffic stop for field sobriety testing. Accordingly, Aicher maintains that he was unlawfully detained by Lambert in violation of his Fourth Amendment rights.

**{¶ 16}** "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures." (Citation omitted.) *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7. "Stopping an automobile is reasonable if an officer has probable cause to believe that a traffic violation has occurred." *State v. Brown*, 2d Dist. Greene No. 2011 CA 52, 2012-Ohio-3099, ¶ 13, citing *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). However, "[a]n officer cannot continue to detain a suspect past the time necessary for investigating and completing the initial traffic stop merely to conduct a 'fishing expedition' for other criminal activity." *Id.*, quoting *State v. Jones*, 2d Dist. Montgomery No. 23920, 2010-Ohio-5522, ¶ 16. To justify further detention for the administration of field sobriety tests, "the officer must have a reasonable, articulable suspicion that a person is driving under the influence[.]" *Id.*, citing *State v. Santiago*, 195 Ohio App.3d 649, 2011-Ohio-5292, 961 N.E.2d 264, ¶ 11

(2d Dist.).

{¶ 17} "Whether an officer had a reasonable, articulable suspicion to administer field sobriety tests is a 'very fact-intensive' determination." *Santiago* at ¶ 13, quoting *State v. Wells*, 2d Dist. Montgomery No. 20798, 2005-Ohio-5008, ¶ 9. In determining whether there was a reasonable, articulable suspicion, the court must evaluate the totality of the circumstances. (Citation omitted.) *State v. Gladman*, 2d Dist. Clark No. 2013 CA 99, 2014-Ohio-2554, ¶ 14. These circumstances must be considered " 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *Id.*, quoting *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14. If there are no articulable facts that give rise to a suspicion of illegal activity, then the continued detention constitutes an illegal seizure. *State v. Robinson*, 2d Dist. Greene No. 2001 CA 118, 2002 WL 1332589, *2 (June 14, 2002), citing *State v. Robinette*, 80 Ohio St.3d 234, 240, 685 N.E.2d 762 (1997).

{¶ 18} As this court has stated previously, "[m]any observations can satisfy this reasonable, articulable suspicion, including the odor of an alcoholic beverage emanating from the vehicle, glassy bloodshot eyes, * * * and slow or slurred speech." (Citation omitted.) *Brown* at ¶ 13. However, this court has "not required any specific number of indicators, nor have we adopted a balancing test." *State v. Adams*, 2017-Ohio-7743, ___ N.E.3d ___, ¶ 33 (2d Dist.).

{¶ 19} It is well established by this court that traffic violations of a de minimus nature, combined with a slight odor of an alcoholic beverage, and an admission of having consumed "a couple of beers," are insufficient to support a reasonable, articulable suspicion of driving under the influence. *State v. Spillers*, 2d Dist. Darke No. 1504, 2000

WL 299550, *3 (Mar. 24, 2000). *See also State v. Morgan*, 2d Dist. Clark No. 07-CA-67, 2007-Ohio-6691, ¶ 9 (one de minimus marked-lane violation, the odor of alcohol of unspecified intensity, and an admission of consuming alcohol earlier in the day did not provide reasonable, articulable suspicion of driving under the influence).

{¶ 20} On the other hand, this court has found a reasonable, articulable suspicion of driving under the influence where a moderate odor of alcohol is detected in conjunction with multiple other factors, such as glassy or bloodshot eyes, slurred speech, a flush face, fumbling, or unresponsiveness. *See Gladman,* 2d Dist. Clark No. 2013 CA 99, 2014-Ohio-2554, at ¶ 17-18 (moderate odor of alcohol about motorist's person, glassy and bloodshot eyes, slurred speech, unresponsiveness to request for registration and proof of insurance, and admission of consuming three beers in the last hour provided a reasonable, articulable suspicion of driving under the influence); *Adams* at ¶ 8, 9, and 34 (moderate odor of alcohol emanating from the defendant's vehicle, glassy eyes, a flush face, fumbling with insurance card, minor traffic violation, and admission of consuming one drink three hours earlier provided a reasonable, articulable suspicion of driving under the influence); *State v. Criswell*, 162 Ohio App.3d 391, 2005-Ohio-3876, 833 N.E.2d 786, ¶ 2-3 and 10 (2d Dist.) (moderate odor of alcohol on defendant's breath, bloodshot and glassy eyes, driving 23 mph over the speed limit, and admission to having a few beers justified conducting field sobriety tests).

{¶ 21} However, in *State v. Nelson*, 2d Dist. Montgomery No. 27324, 2017-Ohio-2884, this court recently affirmed the trial court's finding that no reasonable, articulable suspicion of intoxication existed under circumstances where: (1) the investigating officer detected a moderate odor of an alcoholic beverage emanating from the defendant's

vehicle; (2) the odor of alcohol intensified as defendant spoke; (3) the officer observed that the defendant had bloodshot and somewhat watery eyes; and (4) the defendant was pulled over for a de minimus moving violation. *Id.* at ¶ 10 and 21. In that case, although the investigating officer testified that the defendant advised him that she "had been drinking last night," the trial court found this testimony did not establish that the defendant admitted to drinking on the night of the traffic stop. *Id.* at ¶ 10 and 13. The officer in that case also testified that the defendant exhibited surprise or confusion as to what day of the week it was, but the trial court found that this testimony was improper to consider given that the defendant exhibited such confusion after the investigating officer had already decided to conduct the field sobriety tests. *Id.*

**{¶ 22}** In deferring to the trial court's findings of fact in *Nelson*, we found that the moderate odor of alcohol that intensified as the defendant spoke, the defendant's bloodshot and watery eyes, and the de minimus moving violation did not provide the officer with a reasonable, articulable suspicion of intoxication for purposes of justifying field sobriety testing. *Id.* at ¶ 21. *But see id.* at ¶ 25 (Tucker, J. dissenting.) ("[T]he trial court's factual conclusions regarding Nelson's excursions into the opposite lane of travel and, on the second occasion, driving across her lane of travel nearly striking the curb on the right side of the road coupled with the moderate odor of alcohol emanating from Nelson and Nelson's denial of recent alcohol consumption in the face of a moderate odor of alcohol are specific and articulable facts which, I suggest, compel the conclusion there existed a reasonable, articulable suspicion Nelson was impaired.").

**{¶ 23}** Additionally, in *State v. Dixon*, 2d Dist. Greene No. 2000-CA-30, 2000 WL 1760664 (Dec. 1, 2000), this court held that there was no reasonable, articulable

suspicion of driving under the influence where an officer stopped a motorist for a window tint violation and noticed the motorist had glassy, bloodshot eyes, detected the odor of alcohol on the motorist's person, and the motorist admitted to consuming "one or two beers." *Id.* In so holding, this court considered the fact that the traffic violation did not involve erratic driving and that the motorist's glassy, bloodshot eyes were "readily explained by the lateness of the hour, 2:20 a.m." *Id.* at *2. We further explained that "the mere detection of an odor of alcohol, unaccompanied by any basis, drawn from the officer's experience or expertise, for correlating that odor with a level of intoxication that would likely impair the subject's driving ability, is not enough to establish that the subject was driving under the influence." *Id.*

{¶ 24} Although not binding on this court, in *State v. Montelauro*, 10th Dist. Franklin No. 11AP-413, 2011-Ohio-6568, the Tenth District Court of Appeals found that a reasonable, articulable suspicion of driving under the influence existed under circumstances very similar to the instant case. In *Montelauro*, the investigating officer conducted a traffic stop due to the defendant having expired license plates. *Id.* at ¶ 9. Thereafter, upon approaching the defendant's vehicle, the officer noticed that the defendant had glassy, bloodshot eyes and immediately detected an obvious odor of an alcoholic beverage emitting from the vehicle. *Id.* at ¶ 10. During his testimony, the officer acknowledged that he did not "feel comfortable saying strong, moderate or light" with respect to the intensity of the odor of alcohol, but he explained that it was "just obviously an odor of alcoholic beverage, something I've come to detect and I find difficult to quantify," and that "it's just an obvious odor, that's what it is, and it's obvious and apparent to me." *Id.* Moreover, when the officer asked the defendant if he had been

drinking the defendant indicated that he had consumed a Long Island Iced Tea. *Id.* at ¶ 11. The defendant further advised the officer that he was coming from a billiards bar that the officer knew was having a half-price drink special that night. *Id.* at ¶ 12.

{¶ 25} In analyzing whether the officer had a reasonable, articulable suspicion of intoxication to justify field sobriety testing, the court in *Montelauro* discussed our holding in *Dixon* and found it distinguishable. The court explained that:

[T]he facts here are sufficient to provide reasonable suspicion to conduct field sobriety tests. Although the issue is less clear than it might otherwise be if the officer had characterized the odor of alcohol as either slight, moderate or strong, the officer nonetheless noted an obvious odor of alcohol, which the trial court concluded was more than slight, defendant's admission to drinking Long Island Iced Tea, not one or two beers, the officer knew drinks were half price that night, and defendant had glassy, bloodshot eyes, all giving the officer a reasonable, articulable suspicion to conduct field sobriety tests.

*Montelauro* at ¶ 19. *See also State v. Dierkes*, 11th Dist. Portage No. 2008-P-0085, 2009-Ohio-2530, ¶ 3-6, 25, and 33 (finding that a reasonable, articulable suspicion of driving under the influence existed under circumstances where the officer pulled the defendant over at 4 a.m. for a license plate violation and where the officer noticed a moderate odor of alcohol emanating from the vehicle and the defendant's breath and the defendant admitted to consuming four or five beers seven hours prior).

{¶ 26} Admittedly, there are some aspects of this case that are analogous to *Nelson* and *Dixon*. Nevertheless, upon a thorough review of the record, we find those

cases are distinguishable and that the present case is more akin to *Montelauro* and *Dierkes*. Unlike *Nelson*, Officer Lambert testified that Aicher admitted to having a couple of alcoholic beverages and to having come from a known bar district in downtown Dayton. Unlike *Dixon*, Lambert quantified the odor of alcohol he smelled on Aicher's breath as moderate. Unlike both *Nelson* and *Dixon*, Lambert testified that he detected a faint odor of burnt marijuana coming from Aicher and noticed that Aicher was slurring some of his words slightly. While the video evidence indicates that Aicher's speech was not overly impaired, his speech was nevertheless slow and slightly slurred at certain times.

{¶ 27} Therefore, considering the hour of the traffic stop, the moderate odor of alcohol coming from Aicher's breath, the faint odor of burnt marijuana emanating from Aicher's person, Aicher's admission to drinking a couple of alcoholic beverages at a known bar district, and Aicher's slightly slurred speech and glassy eyes, we find that the totality of the circumstances indicate that Officer Lambert had a reasonable, articulable suspicion that Aicher was driving under the influence to justify field sobriety testing. Accordingly, the trial court did not err in overruling Aicher's motion to suppress on that basis.

{¶ 28} Aicher's First Assignment of Error is overruled.

## Second Assignment of Error

{¶ 29} Aicher's Second Assignment of Error is as follows:

THE TRIAL COURT ERRED IN ADMITTING THE BREATH SAMPLE.

{¶ 30} Under his Second Assignment of Error, Aicher contends that the trial court should have suppressed the evidence obtained from his breath sample because the State

failed to demonstrate that the sample was tested in compliance with the Ohio Department of Health's regulations, which are codified under Chapter 3701-53 of the Ohio Administrative Code. Specifically, Aicher argues the State failed to establish that: (1) he was observed for 20 minutes prior to the breath test as required by Ohio Adm.Code 3701-53-02; (2) the Intoxilyzer 8000 at issue was checked for radio frequency interference as required by Ohio Adm.Code 3701-53-04(A)(1); (3) the ethyl alcohol solution used to certify the Intoxilyzer 8000 was refrigerated as required by Ohio Adm.Code 3701-53-04(E); and (4) the dry gas control check conducted during the certification of the Intoxilyzer 8000 tested within the target value at variance greater than 0.005 in compliance with Ohio Adm.Code 3701-53-04(B) and (C).

{¶ 31} Before addressing each of Aicher's claims, we note that "[a]fter a defendant files a motion to suppress the admission of alcohol test results, 'the state has the burden to show that the test was administered in substantial compliance with the regulations prescribed by the Director of Health.' " *Columbus v. Hutchison*, 10th Dist. Franklin No. 15AP-667, 2016-Ohio-3186, ¶ 28, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 24. *Accord State v. Flege*, 2d Dist. Greene No. 06-CA-113, 2007-Ohio-2134, ¶ 18, citing *State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986). "Substantial compliance creates a 'presumption of admissibility' that the defendant can only rebut 'by demonstrating that he was prejudiced by anything less than strict compliance' with the regulations." *Hutchison* at ¶ 28, quoting *Burnside* at ¶ 24, citing *State v. Brown*, 109 Ohio App.3d 629, 632, 672 N.E.2d 1050 (4th Dist.1996).

*The 20 Minute Observation Period*

{¶ 32} For his first argument, Aicher contends that the State failed to demonstrate that he was observed for 20 minutes prior to his breath test as required by Ohio Adm.Code 3701-53-02.

{¶ 33} As a preliminary matter, we note that the appropriate procedure to follow when testing a breath sample depends on which approved breath-testing instrument is used. *See* Ohio Adm.Code 3701-53-02(D) and (E). There is no dispute that Aicher was tested using an Intoxilyzer model 8000 (OH-5) ("Intoxilyzer 8000"), which is approved as an evidence breath testing instrument under Ohio Adm.Code 3701-53-02(A)(3). According to Ohio Adm.Code 3701-53-02(E), breath samples tested with the Intoxilyzer 8000 "shall be analyzed according to the instrument display for the instrument being used." In contrast, breath samples tested with the other authorized breath testing instruments "shall be analyzed according to the operational checklist for the instrument being used[.]" Ohio Adm.Code 3701-53-02(D).

{¶ 34} None of the relevant Ohio Administrative Code provisions specifically provide for a 20 minute observation period; however, we recognize that there is a plethora of case law indicating that the "operational checklist" used for the other types of breath-testing instruments includes a 20 minute observation period before testing. *See Bolivar v. Dick,* 76 Ohio St.3d 216, 218, 667 N.E.2d 18 (1996)*; State v. Tenney,* 2d Dist. Montgomery No. 24999, 2012-Ohio-3290, ¶ 6. Because an Intoxilyzer 8000 was used in this case, Aicher's breath sample was required to be tested in accordance with the machine's "instrument display," not an "operational checklist." The record, however, does not indicate whether the instrument display included a 20 minute observation period. Nevertheless, even if we were to assume that a 20 minute observation period was

required, the evidence presented by the State indicates that it substantially complied with such a requirement.

{¶ 35} "Substantial compliance only requires evidence that during the 20 minutes before the breath test the defendant did not ingest anything that might skew the test result." *Tenney* at ¶ 7, citing *State v. Adams*, 73 Ohio App.3d 735, 740, 598 N.E.2d 176 (2d Dist.1992), citing *State v. Steele*, 52 Ohio St.2d 187, 370 N.E.2d 740 (1977). " 'A witness who testifies to that foundational fact is not required to show that the subject was constantly in his gaze, but only that during the relevant period the subject was kept in such a location or condition or under such circumstances that one may reasonably infer that his ingestion of any material without the knowledge of the witness is unlikely or improbable.' " *Id.*, quoting *Adams* at 740. It is therefore immaterial whether a subject was observed by several different officers. *See Bolivar* at 218 ("[W]hen two or more officers, one of whom is a certified operator of the BAC Verifier, observe a defendant continuously for twenty-minutes or more prior to the administration of a breath-alcohol test, the twenty-minute observation requirement of the BAC Verifier operational checklist has been satisfied.").

{¶ 36} In this case, Officer Lambert testified that he arrested Aicher at 1:22 a.m. and that at the time of the arrest Aicher had nothing in his mouth and had no ability to put anything in his mouth because he was handcuffed. From there, Lambert testified that Officer Spinks transported Aicher to jail. Lambert testified that he saw Aicher approximately 20 minutes later in jail where Aicher was kept in a holding cell and monitored by jailer Peter Morris. Lambert testified that Morris did not report that Aicher ingested anything during his observation of him. Lambert further testified that between

the time he first made contact with Aicher at jail and the time he took the breath test at 2:07 a.m., he did not observe Aicher ingest anything.

{¶ 37} From the foregoing testimony, it can be inferred that Aicher was kept in conditions making it unlikely or improbable that he ingested anything 20 minutes prior to the breath test. This court has stated that once the inference of unlikely or improbable ingestion is shown, "[t]o overcome that inference, the accused must show that he or she did, in fact, ingest some material during the twenty-minute period." *Adams* at 740. Here, Aicher never presented any evidence demonstrating that he did, in fact, ingest something. Accordingly, Aicher's first argument challenging the admission of his breath sample lacks merit.

*Radio Frequency Interference*

{¶ 38} For his second argument, Aicher contends that the State failed to present evidence showing that the Intoxilyzer 8000 used to administer his breath test was checked for radio frequency interference ("RFI") as required by Ohio Adm.Code 3701-53-04(A)(1). Pursuant to that administrative code section:

 (A) A senior operator shall perform an instrument check on approved evidential breath testing instruments *listed under paragraphs (A)(1), (A)(2), and (B) of rule 3701-53-02* no less frequently than once every seven days in accordance with the appropriate instrument checklist for the instrument being used. The instrument check may be performed anytime up to one hundred and ninety-two hours after the last instrument check.

(1) The instrument shall be checked to detect radio frequency interference

(RFI) using a hand-held radio normally used by the law enforcement agency performing the instrument check. The RFI detector check is valid when the evidential breath testing instrument detects RFI or aborts a subject test. If the RFI detector check is not valid, the instrument shall not be used until the instrument is serviced.

(Emphasis added.)

{¶ 39} As noted above, section (A)(1) of Ohio Adm.Code 3701-53-04 applies to "the testing instruments listed under paragraphs (A)(1), (A)(2), and (B) of rule 3701-53-02." The Intoxilyzer 8000 at issue in this case, however, is listed under paragraph (A)(3). As a result, the provision of the code requiring an RFI check does not apply to the Intoxilyzer 8000 at issue. Accordingly, Aicher's second argument challenging the admission of his breath sample lacks merit.

*Refrigeration of Ethyl Alcohol Solution*

{¶ 40} For his third argument, Aicher contends that the State failed to present evidence showing the that the ethyl alcohol solution used to certify the Intoxilyzer 8000 at issue was refrigerated as required by Ohio Adm.Code 3701-53-04(E).

{¶ 41} Pursuant to Ohio Adm.Code 3701-53-04(C):

Representatives of the director shall perform an instrument certification on approved evidential breath testing instruments listed under paragraph (A)(3) of rule 3701-53-02 [i.e., the Intoxilyzer model 8000 (OH-5)] * * * *using a solution containing ethyl alcohol approved by the director of health* according to the instrument display for the instrument being certified. * * *

(Emphasis added.)

{¶ 42} With regard to the ethyl alcohol solution, Ohio Adm.Code 3701-53-04(E) provides that:

A bottle of approved solution containing ethyl alcohol shall not be used more than three months after its date of first use, or after the manufacturer's expiration date on the approved solution certificate, whichever comes first. *After first use, a bottle of approved solution shall be kept under refrigeration when not being used.* The approved solution bottle shall be retained for reference until that bottle of approved solution is discarded.

(Emphasis added.)

{¶ 43} In this case, Ohio Department of Health inspector Robert Norbeck testified that on September 9, 2015, he performed the certification of the Intoxilyzer 8000 that was used on Aicher. Norbeck also identified a copy of his signed certification statement, which was admitted into evidence and read as follows:

On the date I performed the certification, *I opened a new bottle of solution.* When I was done using the solution I disposed of the solution and the bottle, *thus there was no need to refrigerate the solution.* The bottle and solution was discarded the same day it was open and thus not retained for future reference. This bottle was not used more than three months after its date of first use, or after the manufacturer's expiration date on the approved solution certificate.

(Emphasis added.) State's Exhibit D.

{¶ 44} Based on the foregoing statement, it is clear that Norbeck complied with

Ohio Adm.Code 3701-53-04(E) when he certified the breath-test instrument at issue. Based on Norbeck's statement, refrigeration of the ethyl alcohol solution was not required since he used a new bottle of solution during the certification process. Accordingly, Aicher's third argument challenging the admission of his breath sample lacks merit.

*Dry Gas Standard*

{¶ 45} For his final argument, Aicher contends that Norbeck's testimony regarding the certification of the Intoxilyzer 8000 at issue indicated that the dry gas control check performed during the certification tested beyond the target value at variance greater than 0.005 in violation of Ohio Adm.Code 3701-53-04(B) and (C). We disagree.

{¶ 46} Pursuant to Ohio Adm.Code 3701-53-04(B):

Instruments listed under paragraph (A)(3) of rule 3701-53-02 of the Administrative Code [i.e., the Intoxilyzer model 8000 (OH-S),] shall automatically perform a dry gas control using a dry gas standard traceable to the national institute of standards and technology (NIST) before and after every subject test. For purposes of an instrument listed under paragraph (A)(3) of rule 3701-53-02 of the Administrative Code, a subject test shall include the collection of two breath samples. * * * *Dry gas control results are valid when the results are at or within five one-thousandths (0.005) grams per two hundred ten liters of the alcohol concentration on the manufacturer's certificate of analysis for that dry gas standard.* A dry gas control result which is outside the range specified in this paragraph will abort the subject test or instrument certification process.

(Emphasis added.)

{¶ 47} Pursuant to Ohio Adm.Code 3701-53-04(C):

* * * A dry gas control using a dry gas standard traceable to the national institute of standards and technology (NIST) shall also be used when a certification is performed. An instrument shall be certified no less frequently than once every calendar year or when the dry gas standard on the instrument is replaced, whichever comes first. * * * *Instrument certifications are valid when the certification results are at or within five one-thousandths grams per two hundred ten liters of target value for that approved solution.* Instruments with certification results outside the range specified in this paragraph will require the instrument be removed from service until the instrument is serviced or repaired. * * *

(Emphasis added.)

{¶ 48} Here, Aicher claims that Norbeck testified that one of the dry gas control checks conducted during the certification of the Intoxilyzer 8000 at issue tested at 0.011 grams when the target value was 0.100, and that said result is beyond the 0.005 variance permitted by the Ohio Administrative Code. The record, however, does not support Aicher's claim. A review of the record indicates Norbeck actually testified that the two dry gas control checks conducted during the certification process resulted in a reading of 0.101 grams, which is within the allowable .005 variance of the 0.100 target value. *See* Suppression Hearing Trans. (Dec. 14, 2016), p. 14-15. Norbeck's Certification Report, which he identified at trial and was admitted as State's Exhibit A, also indicates that the two dry gas control checks both resulted in readings of 0.101 grams.

{¶ 49} In arguing that the dry gas control tested at 0.011 grams, Aicher relies on the following discussion between the trial court and Norbeck:

COURT: The, if I understand your testimony, you said that you had variances from .99 to, I'm sorry, .099 to **.011** on this, this series you've ran, is that correct?

NORBECK: Yes, yes your Honor.

COURT: So you had a swing of three, three thousandths, and your tolerance is five thousands, is that correct?

NORBECK: Yes sir.

(Emphasis added.) *Id.* at 16.

{¶ 50} Aicher points to the fact that Norbeck agreed with the trial court's statement that one of the readings was 0.011. However, while Norbeck may have agreed with the trial court's numbers at first, he later corrected the mistake when he testified: "I didn't, I didn't testify that it was .011." *Id.* at 33. Norbeck's correction is in line with his prior testimony and the documentary evidence admitted at the suppression hearing. *See* State's Exhibit A. Furthermore, it is clear that the trial court misspoke when it said 0.011, as a 0.011 reading would not have amounted to "a swing of three thousandths," but would have amounted to a variance of 0.088. Therefore, because the record indicates that the dry gas control check was 0.101 grams, thereby falling within the allowed 0.005 variance, Aicher's fourth argument challenging the admission of his breath sample lacks merit.

{¶ 51} Having concluded that all of Aicher's arguments challenging the admission of his breath sample are without merit, we find that the trial court did not err in overruling Aicher's motion to suppress. Accordingly, Aicher's Second Assignment of Error is

overruled.

## Conclusion

**{¶ 52}** Having overruled both assignments of error raised by Aicher, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies mailed to:

Nolan C. Thomas
Brock A. Schoenlein
Hon. Forde J. Newberry – Acting Judge