[Cite as *State v. Turney*, 2020-Ohio-4148.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | Appellate Case No. 28364 |
| Plaintiff-Appellee | : | Trial Court Case No. 2017-TRC-10914 |
| v. | : | (Criminal Appeal from Municipal Court) |
| MARIA TURNEY | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

A M E N D E D   O P I N I O N
(Amending Opinion Rendered June 12, 2020)

Rendered on the 20th day of August, 2020.

. . . . . . . . . . .

STEPHANIE COOK, Atty. Reg. No. 0067101, City of Dayton Prosecutor's Office, 335 West Third Street, Room 372, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

BLAISE KATTER, 3240 Henderson Road, Suite B, Columbus, Ohio 43220
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

**{¶ 1}** Defendant, Maria Turney, appeals from her conviction in the Dayton Municipal Court for operating a motor vehicle under the influence of alcohol (OVI) in violation of R.C. 4511.19(A)(1)(d). Turney contends that the trial court erred in four ways: by overruling her motion to suppress evidence obtained as a result of her detainment and subsequent arrest following a traffic stop, by excluding some of the trial testimony from her expert witness, by omitting a jury instruction that she requested, and by limiting witness testimony and her closing arguments. We conclude the trial court did not err in regard to these assignments and therefore affirm Turney's conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**{¶ 2}** Around 2:30 a.m. on December 16, 2017, University of Dayton Police Officer Tiffany Oldham saw Turney make a wide right-hand turn from Brown Street completely into an opposite-direction lane on Stewart Street before promptly moving into the correct lane. Officer Oldham initiated a traffic stop, and Turney pulled over after making a right-hand turn onto Rubicon Street. Oldham approached Turney's vehicle, and while speaking to Turney, Oldham could smell alcohol coming from Turney's vehicle and on Turney's breath. Officer Oldham also thought that Turney's speech was slightly slurred and that her eyes looked glassy. Meanwhile, Officer Joseph Wilhelm, also a university police officer, arrived to assist Oldham. Officer Wilhelm walked along the passenger side of Turney's vehicle and shone his flashlight inside. On the front passenger floorboard, he saw a bottle containing an alcoholic beverage.

**{¶ 3}** The officers went back to Oldham's cruiser, and Oldham told Wilhelm her observations and concerns about Turney's ability to drive. Oldham asked Wilhelm to

speak to Turney himself to see if he noticed any sign of intoxication. Officer Wilhelm returned to Turney's vehicle and asked her to step out. Once she was out, Wilhelm too thought that Turney's eyes looked red and glassy, and when she spoke, he detected a strong odor of alcohol on her breath. Turney admitted that she had consumed at least one alcoholic beverage.

{¶ 4} Based on his and Oldham's observations, Officer Wilhelm suspected that Turney may be intoxicated, so he asked her to submit to field sobriety tests, and she agreed. He administered several tests, including horizontal gaze nystagmus,[1] the walk-and-turn[2] and one-leg-stand[3] tests. Officer Wilhelm noticed that Turney failed to follow his instructions for the walk-and-turn test. She began the test too soon, took the wrong number of steps, turned incorrectly, and did not walk heal to toe. During the one-leg-stand test, Officer Wilhelm watched as Turney swayed and had to put her foot down three times, which led him to cut the test short. Based on the field sobriety tests and their other

---

[1] In the horizontal gaze nystagmus test, "an officer holds a stimulus, (generally a pen) twelve to fifteen inches away from an individual's face, and the individual is directed to follow the stimulus with his or her eyes."   Officers assess intoxication based on whether the eyes follow the stimulus smoothly, bounce around, or exhibit "involuntary jerking." *State v. Adams*, 2d Dist. Montgomery No. 27141, 2017-Ohio-7743, 97 N.E.3d 1137, ¶ 11.

[2] "The walk-and-turn test requires the suspect to walk a given number of steps, heel-to-toe, in a straight line. The suspect is then told to turn around and walk back in the same manner. During the test, the suspect is told to keep his or her hands at his or her sides. The officer assesses a suspect's performance according to the degree to which the suspect exhibits a lack of balance or coordination." *State v. Homan*, 89 Ohio St.3d 421, 422, 732 N.E.2d 952, fn. 2 (2000).

[3] "The one-leg-stand test requires the suspect to stand with his or her feet together and his or her arms at his or her sides. The suspect is then told to hold one leg straight and forward about eight to twelve inches off the ground for approximately thirty seconds. While in this position, the suspect counts off the number of seconds. At all times, the suspect is to keep his or her arms at his or her sides and to watch his or her raised foot. The officer demonstrates the test before administering it." *Homan* at 422, fn. 3.

observations, the officers arrested Turney for operating a motor vehicle under the influence of alcohol. Upon inventorying the vehicle after the arrest, the officers observed the closed bottle containing an alcoholic beverage on the front passenger floorboard, a "growler," described as a refillable souvenir drinking cup from a bar or liquor establishment, in the rear driver's side seat, and a stray cork.

{¶ 5} The officers asked Turney if she would submit to a breath test, and she agreed. Because the University of Dayton Police Department did not have a breath machine operator available to administer the test, they took Turney to the Dayton Police Department. There, Dayton Officer Jonathan Seiter administered the breath test. It registered a breath alcohol concentration (BAC) level of 0.133, well over the 0.08 legal limit for driving in Ohio. Turney was charged with operating a motor vehicle under the influence of alcohol as an impaired driving offense[4] and as a per se offense under R.C. 4511.19(A)(1)(d) (BAC level of 0.08 - 0.169) and with a marked-lane violation under R.C. 4511.33.

{¶ 6} Turney filed a motion to suppress the results of the field sobriety tests and the breath test. After a hearing, the trial court suppressed the results of the field sobriety tests but not of the breath test. The court concluded that the state had failed to lay the required foundation for admitting the field sobriety tests because they were not shown to have been conducted in compliance with National Highway Traffic Safety Administration (NHTSA) regulations, but it rejected Turney's arguments that the officers did not have

---

[4] She was charged the offense of driving while impaired under either R.C. 4511.19(A)(1)(a) or R.C. 4511.19(A)(1)(h)—the record is inconsistent. Which section was charged does not matter, though, because the state dismissed the impaired driving charge before trial.

reasonable articulable suspicion to detain her for the purpose of administering the tests and that they did not have probable cause to arrest her for an OVI offense.

{¶ 7} In March 2019, the per se OVI was tried to a jury, and the jury found Turney guilty. The trial court also found her guilty of the marked-lane violation. She was sentenced to 180 days in jail with 177 days suspended, with a three-day weekend intervention program in lieu of incarceration, and her license was suspended for one year.

{¶ 8} Turney appeals.

## II. ANALYSIS

{¶ 9} Turney assigns four errors to the trial court.

### A. Motion to suppress

{¶ 10} The first assignment of error alleges:

THE TRIAL COURT ERRED BY OVERRULING THE MOTION TO SUPPRESS.

{¶ 11} Turney contends that, in overruling parts of her motion to suppress, the trial court erroneously concluded that the officers had a reasonable, articulable suspicion that she was intoxicated to justify detaining her for field sobriety testing. Turney also contends that they did not have probable cause to arrest her for operating a motor vehicle while under the influence of alcohol. Turney argues that because her detainment and subsequent arrest were unlawful, the result of the breath test should have been suppressed.

{¶ 12} We apply the following standard of review: "In reviewing the ruling on a motion to suppress, an appellate court must accept the trial court's supported findings of fact as true. The court must then determine whether the facts satisfy the applicable legal

standard; this is done without deference to the conclusion of the trial court." (Citations omitted.) *State v. Brown*, 2d Dist. Greene No. 2011-CA-52, 2012-Ohio-3099, ¶ 12.

*Reasonable, articulable suspicion of intoxication*

{¶ 13} Although Turney does not contest the lawfulness of the initial traffic stop, she argues that she was unlawfully detained because the officers lacked the requisite reasonable, articulable suspicion that she was driving under the influence to justify prolonging the traffic stop for the purpose of field sobriety testing.

{¶ 14} To justify further detention to conduct field sobriety testing after a lawful stop, "the officer must have a reasonable, articulable suspicion that a person is driving under the influence[.]" *Id.* at ¶ 13. To determine whether there was reasonable, articulable suspicion, the court must evaluate the totality of the circumstances, considering them " 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' " *State v. Gladman*, 2d Dist. Clark No. 2013-CA-99, 2014-Ohio-2554, ¶ 14, quoting *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14.

{¶ 15} "Many observations can satisfy this reasonable, articulable suspicion, including the odor of an alcoholic beverage emanating from the vehicle, glassy bloodshot eyes, * * * and slow or slurred speech." (Citation omitted.) *Brown* at ¶ 13. Here, at the suppression hearing, Officer Oldham testified that she saw Turney commit a traffic violation, even if only momentarily, by driving entirely in a lane designated for the opposite direction. Oldham said that she detected the odor of alcohol coming from Turney's vehicle and from Turney herself, and Oldham noticed that Turney's speech was slightly slurred and that her eyes looked glassy. Officer Wilhelm also thought that Turney's eyes looked

red and glassy and detected a strong odor of alcohol on her breath. Based on these observations, the officers decided to expand the scope of the traffic stop to include the field sobriety testing.

{¶ 16} In ruling on Turney's motion to suppress, the trial court implicitly found credible the officers' testimony about their observations. Given the totality of the circumstances testified to by the officers, we conclude that they had a reasonable, articulable suspicion that Turney was driving under the influence to justify detaining her for field sobriety testing.

*Probable cause to arrest*

{¶ 17} Turney next argues that her arrest for operating a vehicle under the influence of alcohol was an unlawful seizure because the officers lacked probable cause to make the arrest.[5]

{¶ 18} Probable cause in the context of an arrest for operating a vehicle under the influence exists if the totality of the circumstances is sufficient to make a prudent person believe that the suspect was driving under the influence. *See State v. Homan*, 89 Ohio St.3d 421, 427, 732 N.E.2d 952 (2000); *Brown*, 2d Dist. Greene No. 2011-CA-52, 2012-Ohio-3099, at ¶ 25.

{¶ 19} Here, in addition to Officer Oldham's initial observations, Officer Wilhelm testified that after Turney had stepped out of her vehicle, he too noticed her eyes and the odor of alcohol on her breath, which he said was strong:

A: * * * [A]t that point in time I observed that her eyes were red and

---

[5] Although the parties argued this issue, the trial court did not address it in its written suppression decision. We consider this an implicit rejection of Turney's argument.

glassy and I detected the strong odor of an alcoholic beverage em[a]nating from her when she spoke.

Q: Ok and you were able to quantify it as strong?

A: That's correct.

(Tr. 53.) Wilhelm later testified again about "the strong odor of an alcoholic beverage that [he] detected from her breath." (Tr. 71.) Turney also admitted to him that she had consumed at least one alcoholic beverage.

{¶ 20} Officer Wilhelm further testified about what he observed while administering the field sobriety tests. He said that while performing the walk-and-turn test, Turney began the test too soon, took an incorrect number of steps, turned incorrectly, and failed to walk heel to toe. He also testified that when Turney attempted the one-leg-stand test, she swayed and put her foot down three times before the end of the test.

{¶ 21} Turney argues that these observations were not admissible, because the results of the field sobriety tests were suppressed by the trial court. (The test results were suppressed primarily because the state did not present, or ask the trial court to take notice of, the NHTSA standards with which the tests must substantially comply.) We disagree with Turney's argument that all the officers' observations during the tests must be entirely ignored because the results were suppressed.

{¶ 22} The Ohio Supreme Court has held that "a law enforcement officer may testify at trial regarding observations made during a defendant's performance of nonscientific standardized field sobriety tests." *State v. Schmitt*, 101 Ohio St.3d 79, 2004-Ohio-37, 801 N.E.2d 446, ¶ 15. According to the Court, these nonscientific field sobriety tests "involve simple exercises, such as walking heel-to-toe in a straight line (walk-and-

turn test)." *Id.* at ¶ 14. We conclude that the officer's observations during the walk-and-turn and the one-leg-stand tests could be considered. *See State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶ 25. (nonscientific field sobriety tests include the walk-and-turn test and the one-leg stand test).

{¶ 23} As we previously noted, the trial court implicitly found both officers' testimony credible. Based on Officer Wilhelm's observations during the nonscientific aspects of the field sobriety tests, the strong odor of alcohol he detected on Turney's breath, and both officers' observations about her glassy eyes, plus the alcoholic beverage that Officer Wilhelm saw beside Turney in her vehicle, we think that a prudent person would have believed that Turney was driving under the influence of alcohol. Therefore, the officers had probable cause to arrest her.

{¶ 24} Because Turney's detainment and subsequent arrest were lawful, the trial court did not err by refusing to suppress the result of a subsequent breath test as long as it was properly conducted.

{¶ 25} The first assignment of error is overruled.

### B. Excluding expert testimony

{¶ 26} The second assignment of error alleges:

THE TRIAL COURT ERRED BY EXCLUDING A RELEVANT, PROBATIVE EXPERT OPINION RELATING TO THE SCIENTIFIC EVIDENCE OBSERVABLE AT A SPECIFIC ALCOHOL LEVEL (BAC).

{¶ 27} The only OVI charge at issue in Turney's jury trial was a "per se" offense based on having a prohibited BAC level in violation of R.C. 4511.19(A)(1)(d), which prohibits a person from operating a vehicle if "[t]he person has a concentration of eight-

hundredths [0.08] of one gram or more but less than seventeen-hundredths [0.17] of one gram by weight of alcohol per two hundred ten liters of the person's breath." A determination that a defendant committed the per se offense in R.C. 4511.19(A)(1)(d) requires only that the trier of fact find that, while operating a vehicle, the concentration of alcohol in the defendant's breath was at the proscribed level. *See Defiance v. Kretz*, 60 Ohio St.3d 1, 573 N.E.2d 32 (1991). "The accuracy of the test results is a critical issue in determining a defendant's guilt or innocence." *Id.* at 34.

{¶ 28} The General Assembly has legislatively provided for the admission of tests used to determine alcohol levels based on the testing of blood, breath, or urine. R.C. 4511.19(D)(1)(b) pertinently states that "[i]n any criminal prosecution * * * for a violation of division (A) or (B) of this section * * *, the court may admit evidence on the concentration of alcohol * * * in the defendant's * * * breath * * * at the time of the alleged violation as shown by chemical analysis of the substance withdrawn within three hours of the time of the alleged violation." Further, the withdrawn breath "shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code." The General Assembly, then, has determined that a breath-test result is reliable evidence when the test complies with Ohio Department of Health (ODH) regulations.

{¶ 29} For this reason, the Ohio Supreme Court has held that a defendant may not attack the general reliability of a properly conducted breath test. *State v. Vega,* 12 Ohio St.3d 185, 190, 465 N.E.2d 1303 (1984); *Cincinnati v. Ilg*, 141 Ohio St.3d 22, 2014-Ohio-4258, 21 N.E.3d 278, ¶ 23. But the Court has said that a defendant may still challenge "the accuracy, competence, admissibility, relevance, authenticity, or credibility of specific

test results or whether the specific machine used to test the accused operated properly at the time of the test." *Ilg* at ¶ 31.

{¶ 30} Here, Turney sought to challenge her breath-test result with expert testimony. A portion of the testimony excluded by the trial court was proffered outside the presence of the jury. Turney's witness, Dr. Robert Belloto, a pharmacologist and toxicologist, testified by reference to an article, "Acute Alcohol Intoxication," published in the European Journal of Internal Medicine 19 (2008) at 561-567 (Defendant's Exhibit 1 for purposes of appeal). The article contained a brief table, part of which listed "main clinical symptoms" of a person with a BAC level between 0.1 and 0.2.

Q: So Dr. Belloto, you have a study there in front of you that talks about that – or a paper that talks about that?

A: Yes, it's a review of alcohol intoxication.

Q: Tell me the name of the article.

A: Acute alcohol intoxication

Q: And does it discuss the symptoms of alcohol - the effects of alcohol at both low levels and at higher levels?

A: Yes.

Q: And here all I want to know is I'm looking at an alcohol level that would be above a .1 but below a .2.

A: Ok.

* * *

Q: So can you just tell me what those – what those symptoms would be that you expect to see for someone who had over a .1 alcohol level?

A. Over .1?

Q: Yeah.

A: Possibly but not absolutely.

Q: Right.

A: Slurred speech, hyperreflexia * * * dizziness, lack of coordination, mood personality, behavior changes, prolonged reaction time * * * amnesia might be getting in to the .2 there.[6]

(Tr. 511-512.) The proffer continued with Dr. Belloto testifying that he reviewed the police videos available in discovery to see if Turney's symptoms that he observed on the recordings were consistent with someone who had a .133 BAC. Dr. Belloto expressed his opinion "[t]That it was not consistent" (Tr. 513) and he did not see symptoms in the .1 to .2 range.

{¶ 31} The trial court did allow substantial testimony from Dr. Belloto. He testified before the jury about the design and theories behind the DataMaster breathalyzer's

---

[6] Curiously, Dr. Belloto skipped over "nystagmus" as a symptom listed on the table he was apparently reading from, which might have opened the door for rebuttal evidence that Turney *did* display nystagmus. The article's table does not list nystagmus only as detected in substantial compliance with NHTSA guidelines. Query whether observable signs of nystagmus, excluded from the state's case-in-chief for lack of presentation of NHTSA guidelines, would have been admissible in rebuttal to show Turney *did* show signs and symptoms of nystagmus expected in a BAC range of .1 to .2?

Even more curious, in researching whether there was any case where Dr. Belloto's opinions that were excluded here may have been admitted, we stumbled upon a case in which he submitted a report with information diametrically opposed to the intended expert evidence in this case. In *State v. Foster*, 8th Dist. Cuyahoga No. 108340, 2020-Ohio-1379, during Dr. Belloto's testimony, defense counsel attempted to introduce a "dose-response" curve chart that was part of Dr. Belloto's report in order to show "that *a person's blood-alcohol content level is not indicative of intoxication or the appearance of intoxication*." (Emphasis added.) *Id.*

operation. He testified about limitations of the DataMaster and why a test might be inaccurate, and he testified about how gastroesophageal reflux disease might affect a test result. But the trial court concluded that testimony about impairment at various BAC levels or Turney's display of impairment symptoms from the videos was irrelevant in the prosecution of a per se OVI offense and that that testimony could confuse or mislead the jury, and therefore the court did not allow it. This exclusion is the subject of the second assignment of error.

{¶ 32} We begin our analysis of this assignment with the standard of review. "[T]he admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice. Thus, our inquiry is confined to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues * * *." (Citations omitted.) *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62. We also consider that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger * * * of confusion of the issues, or of misleading the jury." Evid. R. 403(A). For multiple reasons, we find no abuse of discretion in the exclusion of the proffered evidence as inadmissible or in the determination that the value of the excluded evidence was substantially outweighed by danger of confusion of the issues and misleading the jury.

{¶ 33} The trial court relied on *State v. Boyd*, 18 Ohio St.3d 30, 479 N.E.2d 850 (1985), to conclude that Dr. Belloto's expected-behavior testimony was irrelevant. The actual BAC test level in the *Boyd* case was not specified in the opinion, but it was undoubtedly at or above .10, which was the per se floor at that time. The Ohio Supreme

Court held that whether a defendant was actually impaired is irrelevant to a per se offense: "Standing alone," a defendant's "appearance, manner of speech and walking, and lack of any symptoms of intoxication are not relevant evidence and, therefore, not admissible." *Id.* at 31. The Court determined that testimony from a lay witness that the defendant "walked in a normal manner, that his speech was normal, and that at all times he was not under the influence of alcohol" was inadmissible. *Id.* at 30. Despite the fact that the excluded testimony in Turney's case would have been from an expert, we see little if any difference. The proffered expert testimony would have been twofold: 1) that in a range of .100 to .200 BAC a person would be expected to have certain symptoms, and 2) that the expert did not observe those symptoms in Turney on the videos. Both areas of testimony would essentially be evidence to suggest that Turney was not impaired enough to have tested .133. Such testimony is not functionally different than testimony that she "walked in a normal manner, that [her] speech was normal, and that at all times [s]he was not under the influence of alcohol" to a level of .133 BAC. In other words, the testimony would have been that Turney was not impaired to the level the witness would have expected for that BAC level. Such testimony would go to impairment, which under *Boyd* is simply inadmissible when a per se violation is the only charge.

{¶ 34} Turney argues the excluded evidence was permitted under *Vega*, 12 Ohio St.3d 185, 190, 465 N.E.2d 1303, and *Ilg*, 141 Ohio St.3d 22, 2014-Ohio-4258, 21 N.E.3d 278, because she only challenged the specific test result or whether the specific machine operated properly. We disagree. First of all, *Vega* was not a per se case. *Vega* analyzed the statute that existed before statutory per se violations became effective in Ohio on March 16, 1983. At that time, a test over .10 created a rebuttable presumption that the

offender was driving under the influence of alcohol, so whether the driver was or was not under the influence was an open question for contrary evidence. The holding of *Vega* was simply that an accused may not make a general attack on the reliability of an approved breath-testing machine with expert evidence. But, the court said, "evidence of sobriety, such as a videotape or testimony by the accused or by witnesses concerning the accused's sobriety and the amount of consumption, as well as technical evidence, such as additional chemical tests [and] [d]efense expert testimony as to testing procedures at trial going to weight rather than admissibility is allowed. * * * The presumption created by the scientific test is thus to be considered by the jury and the court along with the other evidence as to whether or not the accused was intoxicated." *Id.* at 189. Because *Vega* involved whether the accused was driving under the influence, an impairment and not a per se violation, its precedential value for a per se case was eliminated by the Supreme Court's subsequent decision in *Boyd,* which we now follow.

{¶ 35} We also conclude *Ilg* is not controlling here. *Ilg* dealt with whether the trial court correctly excluded a breath test result as a sanction for the State's failure to provide discovery of "data from the specific Intoxilyzer 8000 machine that tested [defendant's] breath in order to challenge whether it operated properly on the day of his arrest in an effort to establish that the test results in his case were inaccurate." *Id.* at ¶ 3. Indeed, the syllabus holds that an accused may challenge the "accuracy, competence, admissibility, relevance, authenticity, or credibility of specific test results or whether the specific machine used to test the accused operated properly." But the excluded evidence here did not challenge the process, procedure or circumstances surrounding the administration of her test or the operation or the functionality of the machine. Rather, the evidence was

designed to promote an ethereal inference that, because Turney was not impaired, something must have been wrong with the test. We conclude that type of evidence is prohibited by *Boyd* and is not the type of evidence contemplated about a specific test process or procedure or the machine operation that was permitted by *Vega* or *Ilg.* Accordingly, the trial court did not err by excluding the proffered evidence.

{¶ 36} We have found no case law that supports Turney's contention that the proffered evidence should have been admissible in regard to a per se OVI charge. The closest we found was a case neither party has cited: *State v. Durnwald*, 163 Ohio App.3d 361, 2005-Ohio-4867, 837 N.E.2d 1234 (6th Dist.). In that case, the defendant had been charged under R.C. 4511.19 with both an impairment violation and a per se violation. To prove both charges, the state had presented the result of a properly conducted breath test showing a BAC level of 0.22. The defendant claimed that the result was inaccurate and sought to present expert testimony "to describe the actions and level of impairment shown by a person with an 0.22 BAC test level compared to [defendant's] behavior." *Id.* at ¶ 11. The trial court had prohibited the expected-behavior testimony "for the purposes of refuting the R.C. 4511.19(A)(1) impairment charge." *Id.* at ¶ 50. The Sixth District concluded that the trial court had erred by improperly limiting the expert's testimony. "In our view," said the appellate court, "the expert testimony regarding the expected behavior of a person with a 0.22 BAC level was relevant to [defendant's] defense against the accuracy of his particular BAC test." *Id.* "It was simply an alternative piece of evidence to support [defendant's] theory of the inaccuracy of the specific test and may have assisted and clarified the jury's understanding of the weight to be given to the BAC test results for each charge." *Id.*

{¶ 37} But *Durnwald* was both an impairment and a per se case, and the court of appeals commented that the trial court had not admitted the disputed evidence in response to the impairment charge. That distinction was noted by the Tenth District in *State v. Sabo,* 10th Dist. Franklin No. 04AP-1114, 2006-Ohio-1521. *Sabo* was also both an impairment and a per se case, but unlike *Durnwald*, the disputed evidence in *Sabo* concerned the potential effects of GERD and was presented to rebut only the *per se* charge. Also, in *Sabo* there was no testimony that the defendant even had the condition. It was on these bases that *Sabo* distinguished *Durnwald*. The case before us involved exclusively expected-behavior testimony to rebut a per se charge. We conclude that levels of impairment and comparisons of that behavior to the accused's behavior are not admissible exclusively in regard to a per se charge.

{¶ 38} Assuming arguendo that symptoms at various BAC levels would somehow be admissible, the second part of Dr. Belloto's testimony was inadmissible for a separate reason. His opinion about what he believed he saw or did not see on the videos would have required introduction of the videos upon which he based his opinion. But the jury could have readily determined what appeared on the videos itself and could have readily determined which of the listed symptoms, if any, were evident. Although a jury may not know what symptoms could be expected at different BAC levels (the first part of Dr. Belloto's excluded testimony), there was nothing special about the symptoms Dr. Belloto listed. It was entirely within the knowledge, experience and capability of the jury to watch the videos and determine what symptoms it believed were observable, rather than rely on an expert witness's interpretation of what he thought he saw on the videos. That rendered the second part of Dr. Belloto's excluded testimony inadmissible under Evid. R.

702(A). Pertinent here, a witness may only testify as an expert if "testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons." Because observing the videos and observing how Turney acted and what symptoms appeared was not beyond the knowledge of laypersons, allowing the second part of Dr. Belloto's proffered testimony would have been contrary to the rules of evidence, would have invaded the province of the jury, and would have been inadmissible.

{¶ 39} Secondly, Turney did not provide sufficient foundation for introduction of the article on which Dr. Belloto relied, although that perhaps could have been cured upon proper presentation to the jury. But we note that the article did not indicate how, or from where, the brief table of symptomatology was developed. And the breadth of the category of symptoms from .1 to .2 is so wide we question whether it would be helpful for identifying or narrowing expected symptomatology, i.e. there is no information of which symptoms might appear at what intermediate BAC levels. Indeed, Dr. Belloto's own testimony diminished the accuracy of the symptomatology table. In answering a question as to what symptoms he would expect to see, he replied "possibly but not absolutely." That was likely because the article itself recognized that "several factors" could influence acute alcohol intoxication, such as the amount of alcohol, body weight, tolerance, the percentage of alcohol in a beverage, and the time period of ingestion. Exhibit 1 at 562. Even then, "[s]ymptoms are *usually* related to blood alcohol concentration." (Emphasis added.) *Id.* So the best that could be said is that the listed symptoms *might* appear, but at what intermediate BAC we would not know, and there were many variables. The indefinite and uncertain nature of the proffered evidence presented a danger that its questionable

probative value would be substantially outweighed by risk of confusion or misleading the jury. At the very least, we conclude the trial court did not abuse its discretion in excluding the evidence.

{¶ 40} Perhaps more indicative of the danger of jury confusion was that introduction of the excluded evidence would have made the trial deteriorate into a dispute about Turney's impairment, an issue that was not relevant. The state did not, and was not permitted to, directly introduce evidence of impairment, because this was solely a per se case. Allowing the defense to introduce evidence of lack of impairment would undoubtedly produce a rebuttal response from the state about Turney's poor performance during the non-scientific parts of the field sobriety tests, or her demeanor, comportment, judgment, slurred speech, mood or reaction time. The trial would have devolved into an argument about whether Turney appeared to be impaired, rather than whether she had a prohibited BAC. In this regard we agree with the trial court's determination and conclude that the probative value of the excluded evidence was outweighed by the danger of confusion and misleading the jury about what they had to consider and what they had to decide.

{¶ 41} The second assignment of error is overruled.

## C. Jury instructions

{¶ 42} The third assignment of error alleges:

THE TRIAL COURT ERRED BY NOT GIVING A REQUESTED JURY INSTRUCTION THAT WAS A CORRECT STATEMENT OF LAW AND INSTEAD ISSUED AN INSTRUCTION THAT OMITTED A CRUCIAL PORTION OF THE STATUTE.

Turney argues that the trial court refused to include necessary statutory language in the

jury instruction about the elements of R.C. 4511.19.

{¶ 43} A trial court's refusal to give a particular jury instruction is reviewed for an abuse of discretion. *State v. Echevarria*, 8th Dist. Cuyahoga No. 105815, 2018-Ohio-1193, ¶ 27. But whether a jury instruction correctly states the applicable law is reviewed de novo. *State v. Rac*, 2019-Ohio-893, 124 N.E.3d 878, ¶ 17 (2d Dist.), citing *Echevarria*. Under either review standard, a jury instruction " 'must be viewed in the context of the overall charge, * * *' rather than in isolation." *State v. Burchfield*, 66 Ohio St.3d 261, 262, 611 N.E.2d 819 (1993), quoting *State v. Price*, 60 Ohio St.2d 136, 398 N.E.2d 772 (1979), paragraph four of the syllabus.

{¶ 44} Turney was tried for violating R.C. 4511.19(A)(1)(d), which pertinently states: "No person shall operate any vehicle * * * within this state, if, at the time of the operation * * * [t]he person has a concentration of eight-hundredths of one gram or more but less than seventeen-hundredths of one gram by weight of alcohol per two hundred ten liters of the person's breath." This is the jury instruction given by the court:

> The defendant is charged with operating a vehicle with a prohibited concentration of alcohol in her system in violation of Ohio Revised Code 4511.19(A)(1)(d). Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 16th day of December, 2017, in the City of Dayton, Montgomery County, Ohio, Maria Turney, operated a vehicle with a concentration of eight hundredths of one gram or more but less than seventeen hundredths of one gram by weight of alcohol per two hundred and ten liters of the defendant's breath.

(Tr. 632-633.)

{¶ 45} Turney wanted the phrase "at the time of operation" used, arguing that without the phrase the instruction was an incorrect, or at least incomplete, statement of law. But the court refused, saying that the phrase was redundant. The court reasoned that "operated a vehicle" was already in the instruction and subsumed "at the time of operation." The court also was concerned that the requested phrase might confuse the jury by leading it to think that there was a material difference between "operated a vehicle" and "at the time of operation."

{¶ 46} We think that the instruction given to the jury covered the elements of driving with a prohibited breath-alcohol content under R.C. 4511.19(A)(1)(d). The instruction informed the jury that before it could find Turney guilty, it had to find that she operated a motor vehicle with the prohibited breath-alcohol level. We note too that, though not dispositive, the instruction given by the trial court conformed with the model instruction for this offense in the Ohio Jury Instructions. *See Ohio Jury Instructions*, CR Section 711.19(A)(1)(b)-(j) (Rev. May 2019). Lastly, considering the instruction as a whole, we think that it clearly and fairly expressed the law, and we do not think that Turney was prejudiced by any omission. *Compare Columbus v. Aleshire*, 187 Ohio App.3d 660, 2010-Ohio-2773, 933 N.E.2d 317, ¶ 49-56 (10th Dist.) (concluding that a jury instruction excluding "at the time of operation" clearly and fairly expressed the law and did not prejudice the defendant); *State v. Fisher*, 1st Dist. Hamilton No. C-080497, 2009-Ohio-2258, ¶ 31-33 (concluding the same).

{¶ 47} The third assignment of error is overruled.

### D. Limiting challenges to the breath test

{¶ 48} The fourth assignment of error alleges:

THE TRIAL COURT ERRED BY REPEATEDLY LIMITING THE ABILITY OF COUNSEL TO ATTACK THE WEIGHT OF THE EVIDENCE RELATIVE TO THE BREATH TEST, IN VIOLATION OF THE DEFENDANT'S RIGHT OF CONFRONTATION, DUE PROCESS, AND RIGHT TO PRESENT A DEFENSE.

Turney argues that the trial court improperly excluded testimony about procedures for administering breath tests that, though not legislatively required, would have, according to her, increased the accuracy and reliability of the result.

{¶ 49} We apply the abuse of discretion standard to review the trial court's decision to exclude evidence. *See Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, at ¶ 62.

{¶ 50} As we have already said, because questions of reliability have been legislatively resolved, a defendant may not attack the general reliability of a properly-conducted breath test. *Vega,* 12 Ohio St.3d at 190, 465 N.E.2d 1303; *Ilg*, 141 Ohio St.3d 22, 2014-Ohio-4258, 21 N.E.3d 278, at ¶ 23. But the defendant may still present a reason to doubt the result of her specific breath test by challenging "the accuracy, competence, admissibility, relevance, authenticity, or credibility of specific test results or whether the specific machine used to test the accused operated properly at the time of the test." *Ilg* at ¶ 31.

*Limitations on defense questioning*

{¶ 51} Dr. Belloto, the defense expert, claimed expertise on breath tests. His report stated that he intended to testify about the design and limitations of the BAC DataMaster—the device used to test Turney's breath—and additional steps that should

have been taken that would have provided more confidence in the result. Dr. Belloto also intended to testify that Turney's result should not have been relied on. The trial court, on the state's motion in limine, issued an order that prohibited Dr. Belloto from testifying about the design, limitations, validity, and reliability of BAC DataMaster devices in general and prohibited him from testifying about additional steps, beyond the manufacturer's recommended procedures, that could have been taken. But the court made an exception for testimony about the device's diagnostic function. The court also allowed Dr. Belloto to testify about Turney's specific breath test—the procedures followed, the result, and the result's accuracy and reliability.

{¶ 52} The trial court sustained numerous objections made by the state to questions about breath testing asked by defense counsel of Dr. Belloto and of the state's witnesses. The result, says Turney, was that she was unable to present any testimony about the inadequacies and insufficiencies of breath-test procedures. As examples, she cites: questions about the use of two tests to increase confidence in the result; the testing procedures approved by the ODH compared with standards in the field of forensic science; the use of a second breath test on another device to increase confidence in or the accuracy of the result; the diagnostic function of the BAC DataMaster; the possibility of radio-frequency interference; additional steps that could have increased the reliability and accuracy of the result; and the (in)adequacy of police training and procedures that may affect confidence in the result. Turney argues that the trial court basically barred any testimony about breath-test procedures other than those required by the ODH.

{¶ 53} Importantly, Turney does not argue that the trial court barred testimony that her specific breath test was affected by any of these alleged problems. For example, the

court did not bar testimony that the specific location where her breath test occurred was particularly vulnerable to radio-wave interference or that the BAC DataMaster used to test her was affected by such interference. Turney cites no example of the court barring defense counsel from asking about whether additional steps were necessary to ensure a reliable and accurate result in her specific situation. In fact, just the opposite was true, as Turney was permitted to challenge the credibility and accuracy of the specific BAC DataMaster on which she was tested. Defense counsel cross-examined Officer Seiter, the officer who conducted Turney's breath test, at length about the device's diagnostic function, about Seiter's decision not use this function when he administered Turney's test, and the significance of not using it. Defense counsel was also permitted to ask Officer Seiter if he could ask a subject to submit to a second test, and there was testimony that nothing prevented an officer from administering a second breath test.

{¶ 54} During Seiter's cross-examination, what the state often objected to was not the testimony sought but the (mis)characterization implied by defense counsel's questions that, in administering the breath test, Officer Seiter followed only the "government minimum," that is, the minimum steps required by the ODH. The state pointed out that this erroneously suggested that more was needed than simply complying with ODH regulations. The state had a point. The Ohio Supreme Court cases on this issue consistently hold that, when a breath test is administered in accordance with ODH regulations, the result of the test is reliable. So not taking additional steps, like those that Turney wanted to ask about, did not undermine a properly conducted test's reliability.

{¶ 55} There was no dispute that Turney's breath test was properly done in that all applicable ODH regulations were followed. The testimony that the trial court excluded

challenged the general reliability of a properly-conducted breath test, not the reliability of Turney's specific test. The law does not permit such challenges. Although Turney thinks that she should have had the right to present general-reliability challenges, appellate courts are " ' "charged with accepting and enforcing the law promulgated by the Ohio Supreme Court, not changing, modifying or ignoring that law." ' " *Sabo*, 10th Dist. Franklin No. 04AP-1114, 2006-Ohio-1521, at ¶ 34, quoting *State v. Miskel*, 10th Dist. Franklin No. 99AP-482, 2000 WL 311920, *2 (Mar. 28, 2000), quoting *Columbus v. Duling*, 10th Dist. Franklin No. 96APC07-859, 1997 WL 142502, *2 (Mar. 31, 1997). " 'Any change in the law regarding a defendant's right to challenge the general scientific reliability of a breath testing device must come from the Ohio Supreme Court, not this court.' " *State v. Eberts*, 10th Dist. Franklin No. 99AP-1327, 2000 WL 1376447, *2 (Sept. 26, 2000), quoting *Duling* at *2; *Sabo* at ¶ 34 (quoting the same).

**{¶ 56}** Because the Ohio Supreme Court has prohibited challenges to the general reliability of properly-conducted breath tests, we must reject Turney's argument that the prohibition violated her constitutional rights. We note, though, that the United States Court of Appeals for the Sixth Circuit concluded in *Miskel v. Karnes*, 397 F.3d 446 (6th Cir.2005), that the prohibition does not deny a defendant the right to confront witnesses or violate the defendant's due-process right to present a complete defense, because it does not preclude the defendant from challenging the specific breath test at issue. We further note that the federal district court decision on which Turney primarily relies, *Knapke v. Hummer*, S.D.Ohio No. 2:10-cv-485, 2012 WL 1883854 (May 21, 2012) (a state case that was before the federal court on a writ of habeas corpus), acknowledged that it was bound by *Miskel*'s holding that the prohibition is constitutional. The reason that

*Knapke* found a constitutional violation was because the trial court had prevented the defendant from challenging the accuracy and reliability of the specific testing device used.

{¶ 57} Here, like in *Miskel*, the trial court did not prohibit challenges to the specific breath test at issue. The problem was that Turney wanted to challenge the general reliability and accuracy of testing procedures. As both *Miskel* and *Knapke* agree, that is not permitted under Ohio Supreme Court law.

*Limitations on defense closing arguments*

{¶ 58} Turney also argues that the trial court erred by sustaining a series of objections to defense counsel's closing arguments about the weight of the evidence, denying the defense the ability to challenge the credibility of her breath-test result.

{¶ 59} The Ohio Supreme Court has said that "[b]oth parties are given latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence." (Citation omitted.) *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 306. " 'Trial counsel may advocate and persuade to the limit of his or her ability and enthusiasm but cannot misrepresent evidence or go beyond the limits set by the trial court.' " *Id*., quoting *State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171, 896 N.E.2d 212, ¶ 45 (4th Dist.). "The assessment of whether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court. Such determination will not be reversed on appeal absent an abuse of discretion." *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph three of the syllabus.

{¶ 60} Turney points to three objections that, she says, the trial court should not have sustained. First, the state objected to defense counsel's assertion that two breath

tests should be required:

> [Defense Counsel]: * * * I think the City of Dayton has let them down in not putting video cameras in the breath test room and has let them down in not basically requiring them to do two tests. Two tests—
>
> The State: Judge I'm going to object here.
>
> The Court: No—objection sustained. There's no requirement whatsoever of two tests.

(Tr. 614.) Second, the state objected to defense counsel's assertion about the breath testing device's diagnostic feature:

> [Defense Counsel]: * * * The City of Dayton could require the officers to do a diagnostic check you heard a lot about.
>
> The State: Judge, I'm going to object. They heard nothing about a diagnostic test and it's not a requirement imposed upon us.
>
> [Defense Counsel]: Your honor, Detective Moyer talked about a diagnostic—that he understood (inaudible) and so did Sergeant Seiter. They can do a diagnostic test.

(Tr. at 614-615.) The trial court pointed out that neither statutory law nor ODH regulations require that a diagnostic check be run before administering a breath test and that there is no such requirement. The court appears to have overruled this objection, saying, "With that [the absence of a legal requirement] in mind go ahead." (Tr. at 616.) Finally, the state objected to defense counsel's assertions about what procedures the city could have followed:

> [Defense Counsel]: * * * The City of Dayton could have provided

The State: Objection again what we could have done is irrelevant.

The Court: Again these are all hypotheticals where there is no evidence that support it. You are directed to disregard it.

(Tr. at 616.)

{¶ 61} We do not think that the trial court abused its discretion by limiting the defense's closing arguments in any of these instances. The court did not allow Turney to challenge her breath test in these ways during trial, so it made sense that the court did not allow the challenges during closing arguments.

{¶ 62} The fourth assignment of error is overruled.

### III. CONCLUSION

{¶ 63} We have overruled each of the assignments of error. The trial court's judgment is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies sent to:

Stephanie Cook
Blaise Katter
Hon. Thomas Hagel